FRUIN-COLNON CORPORATION, TRAYLOR BROS., INC. and ONYX CONSTRUCTION & EQUIPMENT, INC., a Joint Venture, Appellant-Respondent, v NIAGARA FRONTIER TRANSPORTATION AUTHORITY, Respondent-Appellant. (Appeal No. 1.)

Fourth Department, June 5, 1992

APPEARANCES OF COUNSEL

*Saperston & Day, P. C. (James Gresens* of counsel), for appellant-respondent.

*Hurwitz & Fine, P. C.,* and *Mary E. Perla (James D. Gauthier* of counsel), for respondent-appellant.

**OPINION OF THE COURT**

DENMAN, P. J.

This dispute arises from a contract between plaintiff, a joint venture consisting of Fruin-Colnon Corporation, Traylor Bros., Inc., and Onyx Construction & Equipment, Inc., and defendant, the Niagara Frontier Transportation Authority. The contract called for plaintiff to excavate and construct twin subway tunnels, each approximately two miles long, as part of the Buffalo light rail rapid transit system. There are three major areas of dispute. The first, the focus of plaintiff's first cause of action, concerns whether, during its excavation efforts, plaintiff encountered a "differing site condition" (DSC) entitling it to recover $3,255,150 in excess of the contract price of $38,949,800. The second area of dispute concerns which party bears the responsibility for rectifying the infiltration of water into the tunnels. The "watertightness" issue is the focus of plaintiff's second cause of action, which sought $568,297.80 as reimbursement for remedial grouting efforts undertaken by plaintiff before it was ordered off the project. The watertightness issue is also the subject of defendant's counterclaim seeking to recover actual damages (payments to

third parties for remedial waterproofing) and liquidated damages. The third area of dispute, somewhat related to the watertightness issue, is whether plaintiff improperly constructed the tunnel by leaving voids between the concrete tunnel liner and the surrounding rock and by failing to pour the concrete to a minimum thickness of 12 inches. The "tunnel thickness" issue is the subject of defendant's additional counterclaim seeking to recover approximately $750,000 paid to third parties to test the tunnel and bring it into compliance with the contract requirements.

Following a lengthy two-stage trial, the IAS court entered judgment awarding plaintiff $568,297.80 plus 4% interest on its watertightness claim. The court denied plaintiff's DSC claim, and also denied defendant's watertightness and tunnel thickness counterclaims. Plaintiff appeals from that judgment insofar as it denied its DSC claim and failed to award 9% interest on its watertightness claim. Plaintiff contends that the trial proof unequivocally established the existence of a DSC; that the court erred in refusing to admit into evidence a certain letter (in which defendant's subconsultants favorably evaluated plaintiff's DSC claim) as an adoptive admission; and that, by statute, interest should accrue on the judgment at the rate of 9%.

Defendant cross-appeals from the judgment insofar as it granted plaintiff recovery on its watertightness claim and denied defendant's watertightness and tunnel thickness counterclaims. Defendant contends that the contract contained a performance specification that imposed the responsibility for achieving watertightness upon plaintiff. Defendant argues that, consequently, plaintiff was not entitled to extra payment for grouting, that defendant properly terminated plaintiff for its default in correcting the water leakage, that defendant is entitled to recover the cost of remedial work to bring the tunnel into conformity with the contract, and that defendant is entitled to liquidated damages for delay in completion of the work.

Additionally, defendant appeals from a subsequent order granting plaintiff's motion to settle the record on appeal to include Exhibit 212, the aforementioned letter of defendant's subconsultants that plaintiff unsuccessfully sought to admit into evidence in support of its DSC claim. Defendant contends that the document was improperly included in the record because it was not admitted into evidence.

*DSC DISPUTE*

PLAINTIFF DID NOT ESTABLISH THE EXISTENCE

OF DIFFERING SITE CONDITIONS.

In order to prevail on its differing site condition claim, plaintiff was required to prove six elements: the contract documents must have affirmatively indicated the subsurface conditions; plaintiff must have acted as a reasonably prudent contractor in interpreting the contract documents; plaintiff must have reasonably relied on the indications of subsurface conditions in the contract; the subsurface conditions actually encountered must have differed materially from those indicated in the contract; the actual subsurface conditions encountered must have been reasonably unforeseeable; and plaintiff's claimed damages, excess costs associated with extra work and delays allegedly incurred as a result of the unforeseen need to use steel ribbing for temporary support of the tunnel during excavation, must have been solely attributable to such materially different subsurface conditions *(see, Stuyvesant Dredging Co. v United States,* 834 F2d 1576, 1581, *affg* 11 Cl Ct 853, 858; *Weeks Dredging & Contr. v United States,* 13 Cl Ct 193, 218-244, *affd* 861 F2d 728). The court found that the conditions actually encountered did not differ materially from those indicated in the contract documents, and that the conditions actually encountered were not reasonably unforeseeable. The issue thus is whether the court erred in finding that plaintiff failed to prove those elements by a preponderance of the evidence *(Stuyvesant Dredging Co. v United States, supra; Weeks Dredging & Contr. v United States, supra).*

Plaintiff's primary argument is that the court failed to take into account the concession by defendant's expert, Flanagan, that DSCs existed at least to a limited extent. Plaintiff contends that such testimony, in combination with the testimony of plaintiff's experts, eliminated any factual question or issue of credibility and compelled a finding that there were DSCs. Plaintiff's argument ignores the fact that the existence of DSCs is fundamentally a legal judgment, i.e., a question of contract interpretation, not an engineering judgment *(Maffei Bldg. Wrecking Corp. v United States,* 732 F2d 913, 915-916; *Weeks Dredging & Contr. v United States, supra,* at 218). The existence of DSCs depends upon a comparison of the site conditions actually encountered with the affirmative representations of ground conditions contained in the bid and contract

documents *(Foster Constr. C. A. & Williams Bros. Co. v United States,* 435 F2d 873, 881; *Weeks Dredging & Contr. v United States, supra,* at 219). "[T]o the extent [that] the conditions described in the contract materialize, the contractor bears the risk, while the government assumes the risks for conditions [that] the contract documents fail to disclose" *(Erickson-Shaver Contr. Corp. v United States,* 9 Cl Ct 302, 304). The contract is controlling and the expert witnesses were not "experts" in contract interpretation. Indeed, the court was bound to disregard the expert testimony where it was contradicted by the contract and bid documents and unsupported by the facts concerning the conditions unearthed during the work *(Weeks Dredging & Contr. v United States, supra,* at 218).

 Examining the bid and contract documents in their entirety, we conclude that they accurately represented the subsurface conditions actually encountered. More importantly, they adequately put plaintiff on notice of the possible need to employ steel ribbing as temporary support in portions of the excavation. The Engineering Design Rationale (EDR) indicated that rock quality generally would be "average to good" for tunneling, but warned of the existence of localized areas of poor rock quality, opened, weathered, and in some cases "solutioned" fractures, and intersecting vertical and horizontal joints. Similarly, the Tunnel Interpretive Report (TIR) indicated the existence of intersecting joints forming blocks. The TIR explicitly cautioned that such blocks might not be self-supporting as excavation progressed and, depending on local conditions, might require varying levels of primary support. Like the EDR, the TIR specifically warned of areas of relatively permeable and solutionized rock and open, intersecting, and water-bearing joints.

The bid and contract documents also specifically warned of the anticipated need for some steel rib support. The EDR stated that the need for different types of primary support in various areas could not be pinpointed in advance, but could be determined only after excavation revealed the localized conditions. For that reason, plaintiff was contractually bound to keep 50 sets of steel ribs on hand at all times. The TIR projected that steel ribs would be needed in "troublesome areas". The project manual itself was very specific about the need for steel ribs. Plaintiff was responsible for installing and spacing steel ribs where warranted by the conditions encountered during excavation, especially "in areas of excessive overbreak" where necessary to "support the rock safely and

maintain the shape of the tunnel". The critical fact in this case is that the bid schedule estimated that 712,000 pounds of steel ribbing would be required to do the work. Plaintiff's officials and consultants admittedly gave that estimate "no consideration", evidently based on their mistaken assumption that such ribs were for the "mandatory" areas alone, but apparently also because they considered the estimate too pessimistic. However, the bid estimate turned out to be amazingly prescient. In fact, plaintiff was required to install only 703,903 pounds of steel ribs. The evidence unequivocally demonstrates that the claimed DSC zones constitute only about 10% of the over-all tunnel length. Moreover, steel ribs were required to be installed over only about two thirds of the aggregate length of the DSC zones, or in only about 6% of the total tunnel length. Although plaintiff's employees anticipated having to install steel ribs in about 1% of the tunnel length, all indications are that plaintiff's estimate was the product of undue optimism, not reliance on the bid documents. Finally, plaintiff's agreement to be paid at a uniform contract rate for materials and labor employed in the installation of steel ribs undercuts its claim for extra payment for such work. That is especially true since fewer steel ribs were installed than were forecast in the bid estimate. For those reasons, we conclude that plaintiff did not encounter conditions that were materially and unforeseeably different from those indicated in the contract documents.

Alternatively, plaintiff argues that, even if the documents accurately predicted the need for steel ribbing, they did not predict the need to place steel ribs ahead of the gripper pads on the Tunnel Boring Machines (TBM). Indeed, the EDR anticipated that, even where steel ribs would be necessary, they could be erected after the gripper pads had passed. Plaintiff adduced evidence tending to show that the need to place ribs in front of the pads increased and prolonged the work somewhat. Nevertheless, we agree with the trial court's observation that the need to place ribs ahead of the gripper pads did not, by itself, transform an otherwise predictable condition into a DSC. Further, it appears that plaintiff was not required to place all 308 steel ribs ahead of the gripper pads, but only about one third of that number. Plaintiff did not break down its claimed damages in terms of whether the steel ribs were placed before or after the gripper pads had passed. Moreover, it appears that plaintiff's need to place ribs ahead of the gripper pads was the consequence of its ill-

advised purchase of a TBM that would not allow for placement of rock bolts within 10 feet of the face of the excavation, as originally required by the contract. Additionally, plaintiff's claim is undercut by proof that, in the mandatory rib zones, plaintiff requested and obtained permission from defendant to place ribs ahead of the gripper pads rather than behind, as originally required by the contract. That is an indication that placement of ribs ahead of the gripper pads was not as onerous as plaintiff now contends. Plaintiff's claim of delay is further undermined by defendant's proof that the excavation was completed ahead of schedule, and that, even within some of the claimed DSC zones, plaintiff actually gained time. Finally, even if plaintiff lost a small amount of time as a result of having to place steel ribs ahead of the gripper pads, such loss was de minimis and within the risk assumed by plaintiff in entering into the excavation contract. Consequently, the court properly denied plaintiff recovery on its differing site condition claim.

*WATERTIGHTNESS AND TUNNEL THICKNESS DISPUTES*

### THE WATERTIGHTNESS CLAUSE DID NOT

### CREATE A PERFORMANCE SPECIFICATION.

A performance specification requires a contractor to produce a specific result without specifying the particular method or means of achieving that result *(Stuyvesant Dredging Co. v United States,* 834 F2d 1576, 1582, *supra; see, Early v O'Brien,* 51 App Div 569, 576).* Under a performance specification, only an objective or standard of performance is set forth, and the contractor is free to choose the materials, methods and design necessary to meet the objective or standard of performance *(Simmons Co. v United States,* 412 F2d 1360, 1362). Concomitant with control over the choice of design, materials and methods is the corresponding responsibility to ensure that the end product performs as desired *(Simmons Co. v United States, supra).* In other words, the contractual risk of nonperformance is upon the contractor *(Johns-Manville Corp. v United States,* 13 Cl Ct 72, 119, *vacated on other grounds* 855 F2d 1571). That is in contrast to a design specification, where the owner specifies the design, materials and methods and impliedly warrants their feasibility and sufficiency *(MacKnight Flintic Stone Co. v Mayor of City of N. Y.,* 160 NY 72, 83; *Simmons Co. v United States, supra,* at 1363). A contractor must follow

a design specification without deviation and bears no responsibility if the design proves inadequate to achieve the intended result *(see, United States v Spearin,* 248 US 132, 136; *Simmons Co. v United States, supra,* at 1362; *see also, MacKnight Flintic Stone Co. v Mayor of City of N. Y., supra,* at 82-83). In that instance, the contractor's guarantee, even if framed in "absolute" terms, is limited to the quality of the materials and workmanship employed in following the owner's design *(MacKnight Flintic Stone Co. v Mayor of City of N. Y., supra,* at 82, 84). Whether a provision is a performance specification or a design specification depends upon the language of the contract as a whole *(Zinger Constr. Co. v United States,* 807 F2d 979, 981). Other factors to consider include the nature and degree of the contractor's involvement in the specification process, and the degree to which the contractor is allowed to exercise discretion in carrying out its performance under the contract *(Johns-Manville Corp. v United States, supra,* at 120, 131).

 In arguing that the watertightness requirement was a performance specification that plaintiff assumed the responsibility of meeting, defendant relies primarily on the language of article 3.12 (§ 03300) of the contract, the watertightness clause. Read in isolation, article 3.12 appears to be a performance specification; it specifies the end objective (watertightness) and the standards for measuring compliance with that objective, but does not specify the methods of achieving watertightness. Nevertheless, the language and structure of the contract as a whole, as well as the parties' usage and course of performance under the contract, support the conclusion that a design specification was created.

Although the watertightness clause itself does not set forth a particular method for achieving watertightness, the contract as a whole establishes complex and exacting standards for design and construction of the tunnel. Plaintiff was to construct an unreinforced, cast-in-place concrete liner of precise dimension. The type and mix of the concrete was precisely specified, as were detailed requirements for placing, curing, protecting, and finishing the concrete. Plaintiff was given no discretion to deviate from those specifications, whether for the purpose of waterproofing or otherwise. For example, plaintiff had no discretion to install an impermeable outer liner to resist the hydrostatic pressure that both parties knew would exist following completion of construction.

Other provisions of the contract contemplate that water-

proofing would be accomplished by means of fissure grouting, which also was to be carried out pursuant to detailed specifications. Additionally, the payment and warranty provisions of the contract support the conclusion that, as a whole, it created a design specification. The contract explicitly provides that "all measures necessary for achieving the degree of watertightness specified in * * * article 3.12, including remedial treatments to stem leaks", would be paid for at the contract unit prices. It is unlikely that defendant would have agreed to pay plaintiff on a per unit basis if, as defendant contends, plaintiff had assumed the responsibility of achieving watertightness. Further, unlike the general warranty set forth in the contract, the extended watertightness warranty did not provide that plaintiff would remedy water leaks at its own expense, as it would have if plaintiff had assumed the responsibility of achieving watertightness.

The parties' course of dealing prior to construction also supports the inference that a performance specification was not intended. Bidders had no input into the design of the tunnel, nor did plaintiff exercise any independent design judgment after it was awarded the contract. Defendant relies heavily on plaintiff's March 5, 1980 letter submitted in support of its Value Engineering Change Proposal, a type of bilateral change order. In that letter, plaintiff asserted, as a reason why it should be permitted to change the design of the tunnel liners to a "full circle pour", that plaintiff bore the risk of meeting the watertightness requirement. In relying on the language of that letter, defendant overlooks the context in which it was sent. If the contract had created a performance specification with respect to watertightness, it would have been unnecessary for plaintiff to obtain defendant's approval for a design change, and it would have been impermissible for defendant to withhold such approval.

Similarly, the parties' course of dealing during and following construction illustrates that the contract did not establish a performance specification. As evidence that plaintiff undertook the responsibility of waterproofing, defendant cites the fact that plaintiff, on its own initiative, developed and carried out a course of chemical grouting, a method not mentioned in the contract and for which plaintiff did not bill defendant. It is far more significant, however, that defendant routinely denied plaintiff's numerous requests to implement various other waterproofing methods. Even before the concrete liners were put in place, and while the water diversion system was operating,

plaintiff repeatedly requested permission to grout the numerous water-bearing fissures that were present in the exposed rock. Those requests consistently were denied based on defendant's erroneous view that fissure grouting was not intended to achieve watertightness. After the tunnel was constructed and the water diversion system turned off, plaintiff unsuccessfully requested permission to fissure grout, plug the deep wells and piezometer testing holes, and construct a permanent dewatering system. Those requests were denied by defendant, which maintained an uncooperative and obstructive attitude. Plaintiff nonetheless proceeded to fissure grout under protest, based on its proper interpretation of the contract. It would have been unnecessary for plaintiff to seek defendant's consent for such measures, and contractually impermissible for defendant to withhold such approval, if plaintiff were in fact responsible for achieving watertightness and had discretion to choose the means to achieve that objective.

### THE COURT PROPERLY AWARDED PLAINTIFF REIMBURSEMENT FOR ITS FISSURE GROUTING, AND PROPERLY DENIED DEFENDANT RECOVERY ON ITS WATERTIGHTNESS AND TUNNEL THICKNESS COUNTERCLAIMS.

For the foregoing reasons, the court properly awarded judgment to plaintiff on its watertightness claim. Because the contract did not create a performance specification, plaintiff was not contractually responsible for making the tunnels watertight at its own expense. Consequently, plaintiff is entitled to reimbursement for the work performed in an attempt to achieve watertightness. That conclusion is inescapable on examination of the applicable contract provisions. The payment provision of the contract establishes that plaintiff is entitled to reimbursement at the contract unit price for all grouting, including that necessary to achieve watertightness and to remedy water leaks. Similarly, the warranty clause obligates plaintiff to remedy leaks, but strongly implies that such work will be performed at defendant's expense.

Plaintiff's interpretation of the contract, and its conduct toward defendant during the course of the watertightness dispute, were in all respects proper. In accordance with the contract specifications, plaintiff performed fissure grouting in an attempt to achieve watertightness, while insisting on payment for such efforts and requesting permission to undertake

waterproofing measures not specifically contemplated by the contract. Upon defendant's complaint, plaintiff promptly mobilized to remedy water leakage in the tunnels. Within a short time, plaintiff had two shifts of workers engaged in remedial grouting and was readying a third shift. It is evident that plaintiff's remedial efforts were fairly successful and probably would have been concluded reasonably near the deadline set by defendant. Nevertheless, defendant terminated plaintiff for default and ordered it off the job.

In contrast to plaintiff's position, defendant's interpretation of the contract and conduct thereunder were plainly improper. Defendant took the erroneous position that fissure grouting was not a contractually proper means of achieving watertightness, and that plaintiff was not entitled to charge for remedial waterproofing. Additionally, defendant obstructed rather than cooperated with plaintiff's remedial efforts, denying plaintiff permission to implement other measures and remaining silent in response to plaintiff's request for advice on how to proceed. Moreover, despite plaintiff's rapid remobilization of its work force, and its apparent progress in achieving watertightness by means of the remedial fissure grouting contemplated by the contract, defendant terminated plaintiff for default.

Defendant's wrongful termination of plaintiff deprived plaintiff of its contractual right to attempt to cure the water leaks at defendant's expense before defendant could hire third parties. Under the terms of the contract, defendant's wrongful termination of plaintiff for default is deemed to be a termination for the convenience of defendant. For that reason, defendant is not entitled to reimbursement for payments it made to third parties hired to carry out remedial grouting. Also, because termination of plaintiff is deemed to be for defendant's convenience, defendant is not entitled to recover liquidated damages under the contract. Therefore, the court properly denied defendant recovery on its watertightness counterclaim.

Similarly, the court did not err in denying defendant recovery for payments made to third parties for testing of the tunnel liner and repair of alleged defects in it, specifically, for grouting of 17 voids behind the liner and remediation of two of the 18 spots where the liner was less than the required thickness. Denial of defendant's tunnel thickness counterclaim follows as a matter of course from the foregoing determination that defendant wrongfully terminated plaintiff. Under the general warranty provisions of the contract, defendant had

the right to remedy any defect at plaintiff's expense, but only if plaintiff first had been granted the opportunity to cure the defect and had failed to do so. Here, defendant did not discover the alleged defects in the tunnel, and did not incur the costs of third-party remedial efforts, until after it had wrongfully terminated plaintiff. Defendant never instructed plaintiff to repair the defects in the tunnel liner. Thus, plaintiff was not accorded its contractual right to attempt to cure the alleged defects before being charged with the costs of third-party remedial work. Defendant's wrongful termination of plaintiff, and defendant's failure to follow the contract's warranty procedure, compels denial of its tunnel thickness counterclaim.

### OTHER CONTENTIONS

The court properly settled the record on appeal to include the disputed Exhibit 212, the letter in which defendant's subconsultants evaluated plaintiff's DSC claim. Because the document was marked for identification, unsuccessfully offered into evidence, and used for cross-examination, and additionally because its admissibility is an issue on this appeal, the exhibit was properly determined to be part of the record.

The court did not err in refusing to admit the exhibit into evidence as an adoptive admission. Under the admission exception to the hearsay rule, an agent's admission binds his principal only if the agent's responsibility extends to making the statement in question "on his principal's behalf" (*Spett v President Monroe Bldg. & Mfg. Corp.*, 19 NY2d 203, 206; see generally, *Loschiavo v Port Auth.*, 58 NY2d 1040, 1041). Here, the letter was written by subconsultants who had been asked to express an opinion to defendant, not to make liability concessions on its behalf. A party does not, merely by soliciting an expert's opinion in preparation for litigation, make that expert its spokesperson.

Finally, the court properly awarded plaintiff 4% interest on the judgment (Public Authorities Law § 1299-p [5]).

Accordingly, the judgment and subsequent order of the court should be affirmed.

BOOMER, LAWTON, FALLON and DOERR, JJ., concur.

Judgment unanimously affirmed, without costs.