**IACOBELLI CONSTRUCTION, INC., Plaintiff–Appellant,**

v.

**COUNTY OF MONROE, Rochester Pure Waters District, and Calocerinos & Spina Consulting Engineers, P.C., Defendants–Appellees.**

**No. 1460, Docket 93–9193.**

United States Court of Appeals, Second Circuit.

Argued April 15, 1994.

Decided July 21, 1994.

Abba I. Friedman, Birmingham, MI (Eric J. Flessland, Butzel Long, of counsel), for plaintiff-appellant.

Mark J. Moretti, Rochester, NY (Kenneth W. Gordon, Phillips, Lytle, Hitchcock, Blaine & Huber, of counsel), for defendants-appellees County of Monroe and Rochester Pure Waters Dist.

Paul J. Yesawich, III, Rochester, NY (Daniel J. Moore, Harris Beach & Wilcox, of counsel), for defendant-appellee Calocerinos & Spina Consulting Engineers.

Before: FEINBERG, PRATT, and MINER, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This appeal arises out of a contract to construct a sewage tunnel in Rochester, New York. When the plaintiff, Iacobelli Construction, Inc., encountered more subsurface water inflows during construction of the tunnel than it had anticipated, it requested additional compensation under the contract's differing site conditions clause. The County of Monroe denied Iacobelli's request, which led Iacobelli to institute this suit in the United States District Court for the Western District of New York, Michael A. Telesca, *Chief Judge.* The district court held that Iacobelli failed to establish a viable claim for differing site conditions and granted summary judgment for the county.

## FACTS AND BACKGROUND

The Rochester Pure Waters District ("RPWD"), an agent for the County of Monroe in New York, was responsible for the overall administration of the Combined Sewer Overflow Abatement Project for Rochester, New York. Funded primarily by the Environmental Protection Agency ("EPA"), the project involved establishing a network of tunnels for storing sewage overflow during storm periods and for transporting it to a treatment facility. For the purpose of soliciting bids, RPWD combined construction of

two large waste-water tunnels, the Jay–Arnett and Saxton–Colvin tunnels, into one project. The Jay–Arnett tunnel was to be 8792 feet long; the Saxton–Colvin tunnel, 6155 feet. Both tunnels were to have an excavated diameter of twelve feet and were to be constructed in hard rock more than 120 feet underground.

In 1981 RPWD retained Calocerinos & Spina Consulting Engineers ("C & S") to prepare the bid documents and to help administer and supervise the construction. C & S in turn engaged two other firms to perform a geotechnical investigation and to prepare the final tunnel design. RPWD then distributed to prospective bidders the materials prepared by C & S, which contained information about the site conditions, technical specifications for the tunnels, construction plans, and geotechnical information. The geotechnical information included borehole data and descriptions of the subsurface rock conditions. Construction would require excavating the tunnels, removing debris, lining the tunnels with concrete, grouting the connections between tunnel segments, and a final cleanup.

Because the project was funded largely by the EPA, federal regulations required a differing site conditions clause to be part of the contract. It provided:

a. The CONTRACTOR shall promptly, and before such conditions are disturbed, notify the ENGINEER in writing of:

(1) Subsurface or latent physical conditions at the site differing materially from those indicated in this Contract, or

(2) unknown physical conditions at the site of an unusual nature differing materially from those ordinarily encountered and generally recognized as inherent in the work of the character provided for in this Contract.

The ENGINEER shall promptly investigate the conditions and, if he finds that such conditions do materially so differ and cause an increase or decrease in the CONTRACTOR's cost of, or the time required for, performance of any part of the work under this Contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the Contract modified in writing accordingly.

Iacobelli, the low bidder, was ultimately awarded the contract. To prepare its estimate, Iacobelli's tunneling engineer, Jim Peters, reviewed the documents furnished by RPWD, conducted an inspection of the project site, and consulted someone who had previously managed two of Rochester's deep-tunnel projects. Peters concluded that the Jay–Arnett and Saxton–Colvin tunnel sites would be relatively dry, and advised Iacobelli that ground-water inflows should not be sufficiently large to affect operations. Iacobelli structured its bid accordingly.

Construction on the Saxton–Colvin tunnel went smoothly, and it was completed first. However, when Iacobelli began working on the Jay–Arnett tunnel, it encountered three conditions that differed from those it had anticipated from the bid documents: a geological fault, water inflows, and hydrogen sulfide gas. Although Iacobelli had originally planned on constructing both tunnels in essentially the same manner, these three factors forced it to modify its plans in order to complete the Jay–Arnett tunnel in accordance with the contract specifications.

The water inflows created the most difficulty for Iacobelli, because the level of infiltration was much greater than what it had expected. To stave off the additional water, Iacobelli had to perform excavation, concrete-lining, and grouting operations for which it had not originally planned. Consequently, on January 26, 1984, Iacobelli informed C & S that it had encountered

an unknown physical condition at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.

As required by the differing site conditions clause, C & S began investigating Iacobelli's claim. It also requested further information from Iacobelli.

Iacobelli submitted an itemized "Claim for Extra Compensation Resulting from Excessive Water" on May 18, 1984. Stating that water entered the tunnel at a rate of four-hundred gallons per minute more than nor-

mal, causing premature failure in the tunnel boring machine and the muck-conveyor system, Iacobelli requested additional compensation of $757,947. After conducting its own investigation, C & S recommended that the county reject Iacobelli's claim, because it found that the water inflow in the tunnel was not excessive and that it was Iacobelli's own inability to handle the infiltration of hydrogen sulfide gas and failure to dewater which led to the delays in construction of the tunnel. The county finally rejected Iacobelli's claim in mid–1986.

Iacobelli filed this action in December 1988, claiming breach of contract and breach of warranty against the county and RPWD, and claiming negligence against C & S. On October 27, 1992, the district court dismissed Iacobelli's claim against C & S, holding that it was barred by New York's three-year statute of limitations for negligence. The county then impled C & S as a third-party defendant.

On October 13, 1993, the district court granted summary judgment for the county on the remaining claims, holding that there was no evidence to support Iacobelli's claim that "the contract documents failed to give it notice of troublesome water."

### DISCUSSION

On appeal, Iacobelli claims that the district court: (1) erred in granting summary judgment for the county, because a genuine issue of material fact exists regarding whether the encountered conditions materially differed from those indicated in the contract; (2) should not have dismissed its claims of unreasonable interference and breach of warranty; and (3) erred in ruling that its negligence action against C & S was time-barred, because it incorrectly determined the time at which the action accrued. We address each contention in turn.

#### A. *The Differing Site Conditions Claim*

■■■ We review grants of summary judgment *de novo*. *Taggart v. Time Inc.*, 924 F.2d 43, 45–46 (2d Cir.1991). Summary judgment is proper when there exists no genuine issue of material fact, and the mov-

ing party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A material fact is one that would "affect the outcome of the suit under the governing law", and a dispute about a genuine issue of material facts occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For purposes of this decision, we must draw all reasonable inferences and resolve all ambiguities in the light most favorable to Iacobelli, *see Lendino v. Trans Union Credit Information Co.*, 970 F.2d 1110, 1112 (2d Cir.1992) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)), and Iacobelli's allegations must be taken as true. *See Taggart*, 924 F.2d at 46.

■■■ Once construction begins on a project under a contract that is silent about the risk of unforeseen conditions, a contractor bears the risk of running into conditions that were unforeseen at the time he submitted his bid even though they significantly increase the cost of performance. To prevent contractors from bidding on a worst-case-scenario basis, government construction contracts contain a differing site conditions clause. *See North Slope Technical Ltd. v. United States*, 14 Cl.Ct. 242, 257 (1988) (*North Slope*). This clause imposes upon the government the risks for conditions that the contract documents fail to disclose, but leaves upon the contractor the costs of encountering those conditions described in the contract. *See Erickson–Shaver Contracting Corp. v. United States*, 9 Cl.Ct. 302, 304 (1985) (*Erickson–Shaver*). Because the differing site conditions clause alleviates the need for contractors to insert speculative contingency costs in their bids, it reduces inflated bidding, and the government presumably saves money by getting lower bids. *See Youngdale & Sons Constr. Co. v. United States*, 27 Fed.Cl. 516, 527 (1993) (*Youngdale*); *North Slope*, 14 Cl.Ct. at 257; *Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl.Ct. 193, 219 (1987), *aff'd*, 861 F.2d 728 (Fed.Cir. 1988) (*Weeks*). The government may further reduce the contractor's need to pad its bid by furnishing as much information about

the site to the bidders as it can. *Youngdale*, 27 Fed.Cl. at 527.

■ A standard differing site conditions clause, like the one at issue here, allows a contractor to receive an "equitable adjustment" with respect to two types of conditions. *See Youngdale*, 27 Fed.Cl. at 528. This case concerns a "Type I" condition, which is a subsurface or latent physical condition at the site that differs materially from what is indicated in the contract. *Id.* The essential issue in a Type I claim is "whether the contractor could reasonably have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents, his inspection of the site, and his general experience as a contractor." *Erickson–Shaver*, 9 Cl.Ct. at 304 (citing *Perini Corp. v. United States*, 381 F.2d 403, 410, 180 Ct.Cl. 768 (1967)). The contract indications do not have to be explicit or specific, as long as they provide a sufficient basis upon which a contractor can justify having had an expectation of latent conditions that differ materially from those actually encountered. *Youngdale*, 27 Fed.Cl. at 530.

■ To prevail on a Type I differing site conditions claim, a plaintiff must show: (1) the contract documents affirmatively indicate subsurface conditions; (2) she acted as a reasonably prudent contractor in interpreting the contract documents; (3) she reasonably relied on the indications of subsurface conditions in the contract; (4) the subsurface conditions actually encountered differed materially from those indicated in the contract; (5) the actual subsurface conditions were not reasonably foreseeable; and (6) her damage was attributable to the materially different subsurface conditions. *See Weeks*, 13 Cl.Ct. at 218.

■ Interpretation of the contract and bid conditions is a legal judgment made by the court "independently of the evidence presented by, or the arguments of, the parties". *Id.* at 218; *see P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984) (*P.J. Maffei*); *Foster Constr. C.A. & Williams Bros. v. United States*, 435 F.2d 873, 880, 193 Ct.Cl. 587 (1970). The court must examine the bid and contract documents in their entirety, *see Fruin–Colnon Corp. v. Niagara Frontier Transp. Auth.*, 180 A.D.2d 222, 585 N.Y.S.2d 248, 251 (1992) (*Fruin–Colnon*), and step "into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in appellant's situation." *P.J. Maffei*, 732 F.2d at 917 (citations and internal quotations omitted).

Of the six requirements, the district court focused its analysis on the fourth: whether the conditions Iacobelli encountered when constructing the Jay–Arnett tunnel differed materially from those indicated in the contract documents. *See Fruin–Colnon*, 180 A.D.2d 222, 585 N.Y.S.2d at 251. It held that "the contract documents correctly represented the underground conditions, and that there is no material difference between what was indicated in the contract documents and what was actually encountered." Noting that "just how much water was indicated" formed the heart of the dispute, the district court concluded that "[a]lthough the documents do not precisely indicate an anticipated amount of water, review of the documents provides several indications that the contractor would encounter significant amounts".

RPWD supported its motion for summary judgment with affidavits from several experts. In its opposition papers, Iacobelli submitted affidavits of a geotechnical consultant and an underground-construction consultant. The affidavits on behalf of both sides purported to summarize and analyze the site conditions, the contract documents, and the project's results. In deciding the motion, however, the district court completely disregarded the affidavits of Iacobelli's experts, Ronald Heuer and Paul Eller. It stated that both affidavits were conclusory and failed to articulate how they arrived at their conclusions, and labeled Heuer's affidavit as an attempt to "supplant this court's interpretation of the documents with his own conclusions, based upon his interpretation of trade usage". Relying on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989) (*Mid–State*), the district court disqual-

ified the two affidavits from consideration. Therefore, because there was no evidence remaining to contradict the conclusions of RPWD's experts, the district court held that no genuine issue of material fact existed.

■■■ We believe the district court erred in its rejection of the affidavits of Heuer and Eller. Its reliance on *Daubert* was misplaced. *Daubert* sought to clarify the standard for evaluating "scientific knowledge" for purposes of admission under Fed. R.Evid. 702. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795. Accordingly, it provided a method for assessing a proffer of expert scientific testimony, which instructed district courts to examine an expert's scientific theory for (1) its ability to be tested, (2) whether it has been subjected to peer review and publication, (3) its potential rate of error, and (4) its "general acceptance" in the relevant scientific community. *Id.* at ——, 113 S.Ct. at 2796–97.

The affidavits of Heuer and Eller do not present the kind of "junk science" problem that *Daubert* meant to address. *See Tamarin v. Adam Caterers, Inc.,* 13 F.3d 51, 53 (2d Cir.1993) (*Daubert* "specifically dealt with the admissibility of scientific evidence"). Rather, they rely upon the type of methodology and data typically used and accepted in construction-litigation cases. Given the inherently voluminous and highly technical nature of the data in such cases, the parties in a construction-contract dispute usually must retain experts to summarize and interpret that data. *See, e.g., Foster Constr.,* 435 F.2d at 884–86; *North Slope,* 14 Cl.Ct. at 253–61; *Shank–Artukovich v. United States,* 13 Cl.Ct. 346, 352–55 (1987), *aff'd,* 848 F.2d 1245 (Fed. Cir.1988). This case is no different. After reviewing the bid documents, geotechnical data, and geotechnical interpretive reports, Heuer and Eller each presented his own summary and analysis of the Jay–Arnett tunnel site, Iacobelli's contract, and the construction results.

■■■ The district court also erred in holding that the reasoning of *Mid–State* operated to bar consideration of the affidavits. *See Mid–State,* 877 F.2d at 1338–39. In that case, the seventh circuit interpreted rule 56(e)'s provision for affidavits supporting and opposing a motion for summary judgment to "set forth specific facts", *see* Fed.R.Civ.P. 56(e), as requiring experts to set forth their processes of reasoning in their affidavits. *Mid–State,* 877 F.2d at 1339. The court then rejected an economist's affidavit that simply stated seven one-sentence conclusions, without providing background information or any hint of the underlying basis for these statements. *Id.* at 1338–39. Unlike the *Mid–State* affidavit, however, the affidavits of Heuer and Eller do not state conclusions without reference to any facts or reasons. Instead, they explain in detail which documents were reviewed, relevant industry customs and practices, and the general bases for their opinions.

■■■ An affidavit stating the facts upon which the expert's opinion is based satisfies rule 56(e) even if the data supporting the facts is not attached. *M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp.,* 981 F.2d 160, 166 (4th Cir.1992) (*M & M Medical*), *cert. denied,* —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993). Heuer and Eller indicated that they had reached their conclusions after reviewing portions of the bid documents, project correspondence and project records, inspector daily reports, ground-water inflow studies, the predesign engineering report, and various other documents generated by C & S and its subcontractors. Although Heuer and Eller may not have performed as in-depth an analysis as the district court would have liked, their affidavits consisted of more than bare allegations that the encountered conditions differed materially from the contract indications. *See Monks v. General Elec. Co.,* 919 F.2d 1189, 1192 (6th Cir.1990); *Bieghler v. Kleppe,* 633 F.2d 531, 533 (9th Cir.1980). The affidavits described industry practices and customs, defined terms of art used in the industry, explained the approach by which reasonably prudent contractors would interpret the contract documents, and enumerated the conclusions such reasonably prudent contractors would reach.

Not only do the Heuer and Eller affidavits appear to rely on relevant data and employ conventional methods of analysis, they also

raise factual issues that, if true, tend to support Iacobelli's claim. For example, at least one of the county's test boreholes may not have been sealed with grout as it was supposed to have been, and thus may have served as a conduit for ground water into the tunnel. In addition, C & S modified Iacobelli's planned work sequence by issuing interim orders to install cutoff grouting, which may have needlessly interfered with and delayed Iacobelli's excavation and concrete-lining operations. Finally, by recommending acceptance of the project even though the tunnel's rate of water inflow was higher than that specified in the contract, C & S may have been tacitly conceding that the actual subsurface conditions deviated from the contract indications enough to make it impractical to require performance consistent with the contract specifications.

■ We hold that Iacobelli has presented sufficient evidence to demonstrate that there are genuine issues of material fact still in dispute. *See Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 300 (1988). Specifically, genuine issues of material fact exist as to the amount of water that was indicated by the contract documents and how that amount compared to what was actually encountered by Iacobelli. If the encountered amount is found to differ materially from what the contract indicated, then there will be additional questions of how much water infiltrated the tunnel, whether the water affected construction operations, whether the water created additional expenses, and, if so, what the extent of those expenses was. Because Iacobelli has submitted affidavits that "generate[ ] uncertainty as to the true state of a[ ] material fact, the procedural weapon of summary judgment is inappropriate." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). The district court's grant of summary judgment is therefore reversed.

B. *Breach of Warranty by RPWD*

■ Iacobelli's second cause of action relied on the same factual predicate as its differing site conditions claim and alleged that Iacobelli sustained injury because "RPWD warranted the accuracy of its plans

and specifications and the fitness of its plans and specifications for the purposes intended."

When the district court granted summary judgment on the differing site conditions claim, it dismissed Iacobelli's action in its entirety, without discussing the breach of warranty claim. RPWD notes that the breach of warranty claim relies on the same "essential factual suppositions" as the differing site conditions claim and argues that "[f]or the same reasons that Iacobelli's argument under the Differing Site Condition clause failed, so too should its breach of warranty claim."

We agree with RPWD that Iacobelli's differing site conditions claim and breach of warranty claim are closely linked. Because we are reversing the district court's grant of summary judgment on the differing site conditions claim, we hold that Iacobelli's breach of warranty claim should also be reinstated.

C. *Negligence Claim Against C & S*

■ Iacobelli claims that C & S was negligent during three distinct phases of the project: (1) design, (2) construction inspection, and (3) claims administration. It alleges that C & S's inaccurate geological reports and irresponsible administration and supervision of the construction caused it to incur unnecessary delays and expenses. Both Iacobelli and C & S agree that Iacobelli first became aware of the excessive water inflows in November 1983, and that this action commenced in December 1988.

A three-year statute of limitations governs negligence claims in New York. *See* N.Y.Civ.Prac.L. & R. § 214 (McKinney 1990). Iacobelli claims that its negligence cause of action did not accrue until RPWD denied its differing site conditions claim, because until RPWD had finally denied its claim in 1986, its damages were speculative and contingent. C & S counters that Iacobelli was injured and knew it was injured in 1983 and that the limitations period began running then.

The district court held that all of Iacobelli's injuries and damages

first occurred during the construction of the Project when the differing condition

was discovered. Although the repercussions of the alleged negligent conduct and injuries extended beyond the completion of the Project, the triggering event for purposes of the statute of limitations is clearly the time when the excessive water inflow was discovered and the differing site condition was identified.

On this diversity claim, we must apply New York's statute-of-limitations rules. *Diffley v. Allied–Signal, Inc.*, 921 F.2d 421, 423 (2d Cir.1990) (state law determines what events commence an action). New York's three-year statute of limitations for negligence actions begins to run when the injury first occurs. *See Snyder v. Town Insulation, Inc.*, 81 N.Y.2d 429, 432, 599 N.Y.S.2d 515, 615 N.E.2d 999 (Ct.App.1993). Iacobelli knew it had been harmed by the time it submitted its differing site conditions claim in May 1984. Its negligence claim would have been mooted if the county had recognized the differing site conditions claim and awarded the additional compensation that Iacobelli had requested. Nevertheless, when viewed by itself, the negligence claim accrued in May 1984 when Iacobelli knew of the differing site conditions and knew those conditions would increase its expenses. *See Bushwick Hous. Sys., Inc. v. New York City Hous. Auth.*, 160 A.D.2d 588, 554 N.Y.S.2d 233 (mem.) (claim for misrepresentation of subsurface conditions accrued when plaintiff became aware of true subsurface conditions), *appeal denied*, 76 N.Y.2d 706, 560 N.Y.S.2d 988, 561 N.E.2d 888 (Ct.App.1990). Even when Iacobelli's differing site conditions claim was rejected in mid–1986, it still had another year in which to assert the negligence claim against C & S. However, because it waited until 1988 to file this action, its negligence claim is untimely.

Iacobelli argues that nonpayment of its differing site conditions claim was part of its injury and was the "last fact necessary" for it to be entitled to relief. However, none of the cases upon which Iacobelli relies involve a negligence action. *See, e.g., Santos v. District Council of New York City*, 619 F.2d 963 (2d Cir.1980) (suit for enforcement of arbitration award); *Aetna Life & Cas. Co. v. Nelson*, 67 N.Y.2d 169, 501 N.Y.S.2d 313, 492 N.E.2d 386 (Ct.App.1986) (suit by insurance company to enforce statutory lien against damages paid by state); *Memphis Constr., Inc. v. Village of Moravia*, 59 A.D.2d 646, 398 N.Y.S.2d 386 (1977) (mem.) (breach of contract action). Iacobelli has not supplied any cases in which nonpayment of funds was held to be an element of a negligence cause of action, and we decline to so hold here.

Finding no authority to support Iacobelli's claim that its negligence action against C & S did not accrue until RPWD denied its differing site conditions claim, we affirm the district court's dismissal of Iacobelli's negligence claim against C & S.

## CONCLUSION

The grant of summary judgment to the county and RPWD on the differing site conditions claim and the breach of warranty claim is reversed. The district court's dismissal of Iacobelli's negligence action against C & S is affirmed.