Geraldine McCULLOCK,
Plaintiff–Appellee,

v.

H.B. FULLER COMPANY,
Defendant–Appellant.

No. 1188, Docket 94–7883.

United States Court of Appeals,
Second Circuit.

Argued May 12, 1995.

Decided July 27, 1995.

Michael B. Clapp, Dinse, Erdmann & Clapp, Burlington, VT (Diane M. Helland, H.B. Fuller Co., Arden Hills, MN, of counsel), for defendant-appellant.

Lawrin P. Crispe, Crispe & Crispe, Brattleboro, VT, for plaintiff-appellee.

Before: McLAUGHLIN, CABRANES, and PARKER, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Geraldine McCullock won a jury verdict for $75,000 in a diversity action for negligence and strict liability in the United States District Court for the District of Vermont (Lee P. Gagliardi, *Judge*, sitting by designation), against H.B. Fuller Company ("Fuller"), a manufacturer of hot-melt glue. McCullock persuaded the jury that: (1) Fuller failed to warn her about the health hazards associated with the use of its glue; and (2) the glue fumes caused her respiratory health problems, including throat polyps.

On appeal, Fuller argues that the district court: (1) erroneously admitted the testimony of two expert witnesses, neglecting to perform its gatekeeper role laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and (2) improperly denied defendant's motion for judgment as a matter of law.

Because the expert testimony was properly admitted, and because there was sufficient evidence to sustain the verdict, we affirm.

## BACKGROUND

For approximately 16 years Geraldine McCullock toiled at The Book Press, a company that binds and prints books in Brattleboro, Vermont. Then, in 1986, The Book Press began purchasing Fuller's hot-melt glue, HM–949, for use in two of its three binding machines. From 1986 to 1990, McCullock worked as a "pocket filler" on the "HC binder," a binding machine that used Fuller's glue. Her work station was 30 feet from the unventilated "glue pot." McCullock and other employees could smell the glue fumes, especially when the glue pot overheated.

There is no question that Fuller was aware of health problems associated with exposure to the hot-melt glue's vapors. It provided The Book Press with a "Material Safety Data Sheet" ("MSDS") that stated:

WARNING STATEMENTS: Vapors/fumes may be irritating at application temperatures. Contact with molten material will cause burns.

PRECAUTIONARY MEASURES: Avoid breathing vapors/fumes. Use only with adequate ventilation. Avoid contact with molten product.

. . . .

FIRST AID: . . . .

If vapors inhaled: Remove subject to fresh air. Call a physician if symptoms persist.

. . . .

EFFECTS OF OVEREXPOSURE

Eyes: Vapors and fumes may cause irritation

. . . .

Inhalation: Vapors and fumes may cause irritation of the nose, throat and respiratory tract.

Chronic: No anticipated chronic effects[.]

Additionally, affixed to each hot-melt glue container was a warning label:

Sometimes unpleasant odors are given off during the melting operation. If the prescribed working temperature is considerably exceeded for a prolonged period, there is a risk of harmful degradation products being produced. Therefore, at the application temperature, we encourage the use of a local exhaust ventilation system over the pre-melt reservoir.

Consult material safety data sheet [MSDS] for this product before using.

Significantly, both warnings noted that there were health problems associated with the glue, and recommended that it be used only with adequate ventilation. Contrary to Fuller's written recommendations, The Book Press did *not* place a local ventilation system over the glue pot on the HC binder, although

there were ventilation systems over all its other glue pots.

During the four years that McCullock worked on the unventilated HC binder, Fuller's representatives regularly visited the bindery. (Fuller representative, Ed Berry, visited the bindery every three to four weeks.) None of the Fuller representatives ever told McCullock personally about the need for ventilation or the glue's health risks. According to McCullock, she never saw the warning label on the glue container because it was not her job to transfer the glue from the container to the glue pot she used. Likewise, she never saw the MSDS.

Between 1986 and 1990, McCullock developed respiratory symptoms, which gradually developed into throat polyps. In September 1988, Dr. David Fagelson surgically removed a vocal cord polyp. McCullock's health problems forced her to quit her job in March 1990. Thereafter, she had polyps removed on three separate occasions. She has also experienced hoarseness, irritation, and thickening of her vocal cords.

In April 1991, McCullock filed this personal injury action in a Vermont state court, against Fuller. Fuller removed the action to the United States District Court for the District of Vermont, pursuant to 28 U.S.C. § 1441. McCullock sued under theories of negligence and strict liability (failure to warn), alleging that unventilated fumes from the hot-melt glue caused her throat polyps and respiratory problems.

The case was first tried in March 1992. McCullock sought to introduce the testimony of two experts, Jack Woolley and Dr. Robert Fagelson. Woolley, a consulting engineer, would opine as to the adequacy of Fuller's warnings about the dangers of the glue fumes. Dr. Fagelson would testify that the glue fumes caused her ailments. The district court (Franklin S. Billings, Jr., *Judge*) admitted Fagelson's testimony but refused to qualify Woolley as an expert, finding that he lacked the necessary qualifications to testify about the adequacy of Fuller's warnings.

At the close of McCullock's case, the district court granted Fuller's motion for judgment as a matter of law, holding that a manufacturer had no duty to warn a purchaser's employees about the dangers of its product. We reversed and remanded for a new trial. *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 658 (2d Cir.1992) ("*McCullock I*") (under Vermont law, a manufacturer's duty to warn "should not be limited to purchasers but extended to employees of purchasers as well") (internal quotation marks omitted). We also held that the district court properly excluded Woolley's proposed expert testimony. In a footnote, however, we noted "if Fuller argues at [the re]trial that McCullock was outside the zone of danger then Woolley should be qualified as an expert if his testimony is so offered." *Id.* at 658 n. 1. Thus, *McCullock I* noted that Woolley, while unqualified to testify as to the adequacy of Fuller's warning, was qualified to provide expert testimony regarding whether McCullock was in the breathing zone of the hot-melt glue fumes.

On remand, the case was reassigned to Judge Gagliardi. Before the retrial, notwithstanding the above-mentioned footnote, Fuller filed a motion *in limine* to exclude the proposed testimony of Woolley (even though his expected testimony would be limited as per *McCullock I*) and Fagelson, as well. The district court denied the motion entirely.

At the retrial in July 1994, McCullock established Woolley's credentials, which included: Master of Science degree in Industrial Engineering from Purdue University; courses in plant design and industrial safety; Safety Consultant for Bureau of Industrial Research at Norwich University (fifteen years); experience with issues concerning vapors or fumes in an industrial workplace (a "couple of dozen times"); years of practical experience as a consulting engineer; and experience designing ventilation systems. Woolley then testified that McCullock was within the zone of exposure or the "breathing zone" of the fumes emitted from the unventilated glue pot.

As in the first trial, Dr. Fagelson testified as a medical expert to prove medical causation, i.e., the fumes caused McCullock's injury. His qualifications included: Medical Degree from Loyola University of Chicago and internship at St. Joseph's Hospital in Chica-

go (1960); training residency at the Illinois Eye and Ear Infirmary and the Veteran's Administration Hospital in Hines, Illinois; specialty in otolaryngology (diseases of the ears, nose, throat and upper respiratory system) since 1966; certified by the American Board of Otolaryngology in 1966; clinical practice in Brattleboro, Vermont since 1975. He provided the following opinion:

> With reasonable medical certainty my opinion is that Mrs. McCullock's vocal-cord polyps were the result of chronic repeated irritation from fumes resulting from the hot-glue pot; inhalation of the fumes from the hot-glue pot.

The jury returned a verdict for $75,000 on both the negligence and strict liability counts. Fuller now appeals.

## DISCUSSION

### I. *Expert testimony*

Fuller argues that the district court failed to perform its "gatekeeper" function under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Fed.R.Evid. 702. Specifically, it contends that both Woolley and Fagelson were unqualified to testify as experts, and that their opinions were not based on scientific knowledge. We disagree.

The Federal Rules of Evidence permit opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education," and "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue." Fed.R.Evid. 702. Thorny problems of admissibility arise when an expert seeks to base his opinion on novel or unorthodox techniques that have yet to stand the tests of time to prove their validity. Until 1993, the overwhelming majority of courts followed the so-called *Frye* test and excluded such innovative testimony unless the techniques involved had earned "genuine acceptance" in the relevant scientific community. *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

In *Daubert*, the Supreme Court abandoned the *Frye* rule, concluding that *Frye's* rigid standard was inconsistent with the liberal thrust of the Federal Rules. *See Daubert*, —— U.S. at ——, 113 S.Ct. at 2794. *Daubert* granted the trial judge the discretion and authority to determine whether scientific evidence is trustworthy, even if the technique involved had not yet won general scientific acclaim. *Id.* at ——, 113 S.Ct. at 2799 (stating that it is "the trial judge['s] task [to] ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"). It explained that Rule 702 and 104(a) require "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at ——, 113 S.Ct. at 2796. The trial court's assessment will include such factors as the ability to be tested, peer review and publication, and potential rate of error. *Id.* at —— – ——, 113 S.Ct. at 2796–97; *Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir.1994). General acceptance in the relevant scientific community is also an important factor, although it is no longer determinative. *Daubert*, —— U.S. at ——, 113 S.Ct. at 2797; *see Iacobelli*, 32 F.3d at 25.

■ The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous. *See United States v. Diallo*, 40 F.3d 32, 34 (2d Cir.1994); *United States v. Daccarett*, 6 F.3d 37, 58 (2d Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1294, 1295, 127 L.Ed.2d 648 (1994); *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (Friendly, *J.*), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986).

### A. *Woolley*

■ Notwithstanding that we previously stated that Woolley could provide expert testimony regarding whether McCullock was within the "breathing zone" of the glue fumes, *see McCullock I*, 981 F.2d at 658 n. 1, Fuller contends that the consulting engineer is unqualified because (1) he has no formal education related to fume dispersal patterns, and (2) he has no experience performing or

interpreting air quality studies. Moreover, it argues that, on cross-examination, Woolley did not know the chemical constituents of the hot-melt glue, the chemical constituents of any fume emitted by the glue, or the concentration level of the fumes. Finally, it maintains that Woolley's "expert" testimony consisted of a fact that any layman knows—that the concentration of fume particles was reduced as one moved farther from the source of the fumes.

We find that Woolley's testimony easily qualifies for admission under *Daubert*. Fuller's argument ignores Woolley's extensive practical experience. *Supra* pp. 1041–42. Woolley's background and practical experience qualify as "specialized knowledge" gained through "experience, training, or education," Fed.R.Evid. 702, and his testimony was properly admitted. *Cf. United States v. Locascio*, 6 F.3d 924, 937 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1645, 1646, 128 L.Ed.2d 365 (1994); *United States v. Simmons*, 923 F.2d 934, 946 (2d Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991). Fuller's quibble with Woolley's academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility. *See Fernandez v. Chios Shipping Co.*, 542 F.2d 145 (2d Cir.1976).

■ Furthermore, Fuller's *Daubert* contention that Woolley's testimony lacked any grounding in science, and that he merely stated an obvious concept that any layman knows, is meritless. Woolley based his opinion on the following factors grounded in academic and practical experience: examination of various materials and educational sources on safety regarding the ventilation of an HC binder; review of Fuller's MSDS; interviews with McCullock concerning her work area and the glue pot; background industrial experience with ventilation; and practical experience with fumes. Thus, his analysis went far beyond that of a layman.

Woolley had both the practical experience and necessary academic training to testify whether McCullock was in the breathing zone of the glue fumes. The district court therefore did not err, let alone manifestly err, by admitting Woolley's expert testimony.

## B. *Dr. Fagelson*

As to Dr. Fagelson, Fuller cites *Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1113 (5th Cir.1991), *cert. denied*, 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992), for the proposition that holding a medical degree "is not enough to qualify [a doctor] to give an opinion on every conceivable medical question." Fuller points out that this caveat is especially relevant here where Fagelson could not point to a single piece of medical literature that says glue fumes cause throat polyps. Finally, it disputes that the method Fagelson used to come to his medical conclusion, "differential etiology," qualifies as scientific under *Daubert*. We are unpersuaded.

■ Fagelson is an experienced medical doctor, who is certified by the American Board of Otolaryngology and has practiced in the specialty of ears, nose and throat since 1966. We find his background sufficient to permit his expert testimony on a throat ailment and its causes. *See, e.g., Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir.1994) (holding that a doctor was qualified under *Daubert* to give an expert opinion on standard of medical care based on thirty years of experience as a practicing, board-certified cardiologist and his review of the medical records); *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1125 (9th Cir.1994) (holding that the district court properly admitted expert testimony under *Daubert* that was based on, *inter alia*, the doctors' clinical experience and review of the medical records), *cert. denied*, —— U.S. ——, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995). Fuller's suggestion that Fagelson had to be a specialist in environmental medicine to provide expert testimony in this case is an unwarranted expansion of the gatekeeper role announced in *Daubert*.

■ Fuller's contention that Fagelson did not base his opinion on "scientific knowledge" also fails. Under *Daubert*, " 'scientific' im-

plies a grounding in the methods and procedures of science," while " 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, —— U.S. at ——, 113 S.Ct. at 2795. Fagelson based his opinion on a range of factors, including his care and treatment of McCullock; her medical history (as she related it to him and as derived from a review of her medical and surgical reports); pathological studies; review of Fuller's MSDS; his training and experience; use of a scientific analysis known as differential etiology (which requires listing possible causes, then eliminating all causes but one); and reference to various scientific and medical treatises. Disputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony. *See id.* at ——, 113 S.Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Thus, the district court, in the sound exercise of its discretion, properly admitted Fagelson's testimony.

## II. *Judgment as a matter of law*

Fuller contends that McCullock failed to produce sufficient evidence to sustain a jury verdict for negligence and strict liability. We disagree.

█ It is axiomatic that a district court should not grant a motion for judgment as a matter of law unless there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of surmise and conjecture. *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir.1995); *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 542 (2d Cir.1994); *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993). The district court must view the evidence in the light most favorable to the nonmovant, and favor that party with all reasonable inferences. *Purgess v. Sharrock*, 33 F.3d 134; 140 (2d Cir.1994). Upon review, we apply the same standard. *Arkin v. Gittleson*, 32 F.3d

658, 664 (2d Cir.1994); *Samuels*, 992 F.2d at 14.

█ While strict liability and negligence are analytically distinct claims, they become one where liability rests on a failure to warn. As Prosser and Keeton note:

It is commonly said that a product can be defective in the kind of way that makes it unreasonably dangerous by failing to warn or failing adequately to warn about a risk or hazard related to the way a product is designed. But notwithstanding what a few courts have said, a claimant who seeks recovery on this basis must, according to the generally accepted view, prove that the manufacturer-designer was negligent. There will be no liability without a showing that the defendant designer knew or should have known in the exercise of ordinary care of the risk or hazard about which he failed to warn. Moreover, there will be no liability unless [the] manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public. Although this ground of recovery is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability described as the sale of a product in a defective condition....

W. Page Keeton et al., *Prosser and Keeton on Torts*, § 99, at 697 (5th ed. 1984) (footnote omitted). We have embraced this view, *see Fane v. Zimmer, Inc.*, 927 F.2d 124, 130 (2d Cir.1991), and, more importantly, so has Vermont. *See Ostrowski v. Hydra–Tool Corp.*, 144 Vt. 305, 308, 479 A.2d 126, 127 (1984) (citing *Menard v. Newhall*, 135 Vt. 53, 55, 373 A.2d 505, 507 (1977)); *see also McCullock I*, 981 F.2d at 658 n. 2 ("The *Ostrowski* court applied a single standard to plaintiff's claims of negligent failure to warn and strict products liability.").

█ So, under Vermont law, to sustain a verdict premised on a "failure to warn" theory, plaintiff must provide evidence from which a reasonable jury could find: (1) that defendant owed a duty to warn plaintiff; (2) lack of warning made the product unreasonably dangerous, hence defective; and (3) defendant's failure to warn was the proximate cause of plaintiff's injury. *Menard*, 135 Vt.

at 54, 373 A.2d at 506; *see Ostrowski,* 144 Vt. at 308, 479 A.2d at 127; *see also Hobart v. P.J.'s Auto Village, Inc.,* 136 Vt. 287, 289, 388 A.2d 419, 420 (1978) (holding that negligence must be the proximate cause of injury); *see also Scronce v. Howard Bros. Discount Stores, Inc.,* 679 F.2d 1204, 1205–06 (5th Cir.1982) (holding that causation is an essential element in failure to warn claim).

■ The first and second prongs are easily disposed of because in *McCullock I,* we found that a manufacturer's duty to warn " 'should not be limited to purchasers but extended to employees of purchasers as well.' " *McCullock I,* 981 F.2d at 658 (quoting *Ostrowski,* 144 Vt. at 308, 479 A.2d at 128) (internal quotation marks omitted). We went on to rule that the question whether a manufacturer provided adequate warnings about foreseeable dangers " 'was a question properly left to the jury deliberating with the guidance of appropriate instructions.' " *Id.* (quoting *Noto v. Pico Peak Corp.,* 469 F.2d 358, 360 (2d Cir.1972)). Additionally, it is undisputed here that the MSDS and warning label explicitly warned against use of the glue without proper ventilation. Thus, the first two factors were properly submitted to the jury.

As to proximate cause, we find that, *inter alia,* Woolley's and Fagelson's testimony provided an ample basis to carry the issue to the jury. Woolley testified that McCullock was in the breathing zone of the hot-melt glue fumes, and Fagelson testified that inhalation of such fumes caused McCullock's injuries. Furthermore, McCullock testified that she and other employees could smell the unventilated glue fumes, especially when the glue pot overheated. In the face of this testimony, Fuller's argument that McCullock presented no expert testimony that she was exposed to fumes at a concentration sufficient to constitute a hazard is unavailing. Thus, the district court properly denied Fuller's motion for judgment as a matter of law.

## CONCLUSION

Trial judges must exercise sound discretion as gatekeepers of expert testimony under *Daubert.* Fuller, however, would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul—separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.

We have considered Fuller's other arguments and have found them meritless. Accordingly, we affirm the judgment of the district court.

AFFIRMED.