(December 24, 1996)

■ LEXINGTON 360 ASSOCIATES, Respondent, v FIRST UNION NATIONAL BANK OF NORTH CAROLINA, Appellant. [651 NYS2d 490] —Order, Supreme Court, New York County (Beatrice Shainswit, J.), entered April 29, 1996, which denied defendant's motion for summary judgment dismissing the complaint and granted plaintiff's cross-motion to amend the complaint, unanimously reversed, on the law, with costs and disbursements, the motion granted and the cross-motion denied. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

This is an action for breach of a December 31, 1990 modification and estoppel agreement, which modified, in part, a $42,000,000 loan agreement, dated October 14, 1988, among defendant, as lender, plaintiff, as borrower and fee owner of an office building located at 360 Lexington Avenue in Manhattan, and 360 Lexington Avenue Associates (LRA), the tenant of the entire building under a master lease with plaintiff. The loan, non-recourse as to plaintiff and secured by a first mortgage, was, by its terms, to mature on October 14, 1993. Three months after execution of the modification agreement, plaintiff defaulted under the loan and modification agreement by failing to pay real estate taxes and interest. On the basis of this default, defendant, in or about April 1991, drew $450,736.03 on a $2,000,000 master lease letter of credit, which plaintiff had assigned to it pursuant to the modification agreement, and paid $450,736.03 in outstanding real estate taxes. The balance, approximately $1,500,000, was held by defendant in a separate account. Shortly after the March 1991 default under the loan LRA, the net tenant, filed for chapter 11 bankruptcy and, as a result, was able to gain control of a lock box account—income generated by the property and held in escrow—that had been established pursuant to the modification agreement. No debt service was paid either by plaintiff or LRA after the March 1991 default. On September 9, 1991, five months later, while the loan was still in default as a result of plaintiff's continuing failure to pay interest and real estate taxes, defendant applied the $1,500,000 balance from the draw on the letter of credit to the reduction of the principal balance due on the $42,000,000 loan. On September 25, 1991, defendant notified plaintiff in writing that it had applied the remaining $1,500,000 letter of credit proceeds to principal. Notwithstanding such notice, plaintiff failed to protest defendant's application of the remaining letter of credit proceeds to the reduction of principal balance of the loan rather than to interest. The first protest was four years later, when it commenced this action.

On February 4, 1992, defendant, plaintiff and LRA entered into a Bankruptcy Court "so ordered" stipulation, which provided that LRA would have 60 days within which to negotiate a "consensual deal" with either plaintiff or defendant with respect to the mortgage. Should the negotiations fail, the stipulation provided, defendant would become a mortgagee in possession and receive the lock box proceeds. The ensuing negotiations included a contemplated sale of defendant's mortgage. Although plaintiff brought several potential purchasers to defendant's attention, none of their offers were acceptable, even though defendant was willing to sell at a substantial discount.

Thereafter, pursuant to the stipulation, defendant became a mortgagee in possession and, on or about April 4, 1992, obtained the lock box proceeds of approximately $2,300,000. On May 15, 1992, Toledo Investment International, N.A., made an unsolicited, unconditional all-cash $10,000,000 offer, which defendant accepted, to purchase the loan. The loan assignment was completed on May 26, 1992. In June 1992, in an apparent attempt to stave off foreclosure, plaintiff commenced an action against Toledo in Supreme Court, New York County, in which it submitted an affidavit stating, *inter alia*, that the fair market value of the property was no more than "$20 million" in a market that was in a "downward spiral". Toledo commenced its mortgage foreclosure proceeding against plaintiff in August 1992. The loan, never repaid in full, matured, as noted, on October 14, 1993.

In July 1995, almost four years after the remaining letter of credit proceeds had been applied to principal rather than interest, as plaintiff alleges the proceeds should have been applied, and more than three years after the loan assignment to Toledo, plaintiff commenced this action alleging that defendant breached the modification agreement by applying the remaining letter of credit proceeds to principal reduction and by failing to exercise its "best efforts" to notify plaintiff of the contemplated loan assignment to Toledo in May 1992. As a result of these breaches, plaintiff claims, it has been damaged in an amount "presently unknown, but which is believed to be in excess of $25,000,000".

Defendant moved for summary judgment dismissing the complaint primarily on the ground that, as a matter of law, plaintiff sustained no damages by virtue of defendant's purported breach of the modification agreement. Defendant argued that until plaintiff repaid the $42,000,000 it owed and for which the mortgaged property, worth no more than $20,000,000 by plaintiff's own account, was the sole source of repayment, the threshold for plaintiff's sustaining any damages had not been crossed. Plaintiff cross-moved for leave to serve an amended complaint adding new causes of action based on defendant's alleged misuse of the lock box proceeds and its improper use of funds received upon consummation of the modification agreement to satisfy the obligations of another borrower. Without addressing the argument that, as a matter of law, plaintiff had not sustained any damages, the IAS Court denied summary judgment. We reverse.

"In the absence of any allegations of fact showing damage, mere allegations of breach of contract are not sufficient to

sustain a complaint" (*Gordon v De Laurentiis Corp.*, 141 AD2d 435, 436; *Reade v Sullivan*, 259 App Div 229). Where a party has failed to come forward with evidence sufficient to demonstrate damages flowing from the breach alleged and relies, instead, on wholly speculative theories of damages, dismissal of the breach of contract claim is in order. (*See, Kenford Co. v County of Erie*, 67 NY2d 257, 261.)

In opposing summary judgment, plaintiff advanced three theories of damages, none of which has any factual support in the record and all of which are contravened by well recognized principles of contract law. Plaintiff alleges that, but for defendant's misapplication of the remaining $1,500,000 letter of credit proceeds and "misappropriation" of the lock box proceeds, plaintiff, using those funds, would have been able to negotiate a "workout" with Toledo and avoid foreclosure. Plaintiff also contends that had defendant exercised its "best efforts" to notify plaintiff of the contemplated sale of the loan to Toledo, plaintiff would have been able to locate a purchaser willing to refinance the loan on terms beneficial to it. Finally, plaintiff alleges that the loan would not have been in default at the time of the commencement of the foreclosure action but for defendant's misapplication of the $1,500,000 letter of credit proceeds to principal rather than interest.

Initially, we note that the diminished value of the property—no more than $20,000,000 by plaintiff's own admission—coupled with the documented substantial default that would have nonetheless existed even if all the remaining letter of credit proceeds had been applied to unpaid interest and taxes demonstrates the fallacy of plaintiff's "workout" theory. It is clear that the property's net operating income was inadequate to service the $42,000,000 debt at the time of the alleged misapplication and that foreclosure was inevitable, if not on the basis of the arrears documented in the record, then certainly on the basis of the principal remaining unpaid after maturity.

Plaintiff's argument that it was entitled to use the letter of credit proceeds as leverage to negotiate a workout with Toledo or to improve the property so as to increase net operating income is belied by section 1.06 of the modification agreement, which provides, in pertinent part, that the letter of credit proceeds shall be reassigned to plaintiff only "[u]pon payment in full of the Loan." Since it is undisputed that the loan could not be paid in full upon maturity, plaintiff was not entitled to receive the letter of credit proceeds. Moreover, while plaintiff could direct defendant to apply the letter of credit proceeds in accordance with the order of priority provided in section 1.14

of the agreement, it could not use these proceeds as leverage to negotiate a workout with Toledo. Nor could it use the proceeds for tenant improvements, the fourth ranked priority under section 1.14 (b), until all property taxes had been paid, the letter of credit replenished and all interest paid. As the record demonstrates, these three priority requirements were never satisfied. The express terms of the modification agreement similarly precluded plaintiff from using the lock box funds as leverage for a workout with Toledo. Section 1.14 (b) required that these proceeds be used in accordance with a stated order of priority. It is undisputed that all of the lock box proceeds were used to pay interest due under the loan—the very application required by section 1.14 (b)—since there were no open real estate taxes at the time.

Plaintiff's claim that defendant, in breach of section 2.11 of the modification agreement, failed to exercise its "best efforts" to notify plaintiff of the contemplated sale of the loan to Toledo is not supported by the record. Indeed, both plaintiff and defendant as well as LRA were under a Bankruptcy Court order to attempt to negotiate a resolution to the loan and lease defaults, including the possible sale of the loan. During and after the 60-day negotiating period, plaintiff brought potential buyers to defendant, all of whom were rejected. Not only did plaintiff know that defendant was attempting to sell the loan, it was actively involved in attempting to purchase the loan through third parties at or about the time that defendant assigned the loan to Toledo.

Contrary to the IAS Court's holding, nothing in section 2.11 required defendant to identify the purchaser. The only requirement is that defendant "use its best efforts to notify the Borrower of any contemplated sale or assignment by the Lender." The IAS Court's reading of the section adds a completely new obligation to an agreement that is clear and unequivocal. Presumably, such an obligation would be satisfied if, without ever telling plaintiff that it contemplated a sale of the loan, defendant notified plaintiff immediately before signing the contract of sale that it was assigning the loan to Toledo. Here, defendant gave plaintiff at least 60 days notice before the actual sale that it contemplated selling the loan, thus affording plaintiff adequate time to negotiate with defendant and to bring potential purchasers into the discussion. As the record discloses, defendant did, in fact, negotiate with interested potential purchasers brought to it by plaintiff. Thus, defendant complied with both the letter and spirit of section 2.11.

In any event, plaintiff has failed to demonstrate that it was

damaged as a result of defendant's alleged failure to use its best efforts to notify it of the contemplated sale to Toledo. Absent a showing of specific damages resulting from defendant's failure to exercise its best efforts to notify plaintiff of the sale to Toledo, plaintiff cannot recover. (*See, Gordon v De Laurentiis Corp.*, *supra*, 141 AD2d, at 436.) Plaintiffs' so-called "extreme embarrassment" in continuing to negotiate with defendant regarding a sale to a third-party buyer while defendant was working behind the scenes with Toledo is not compensable. Notwithstanding its purely speculative claims that a better deal could have been struck if it had notice of the contemplated Toledo sale, nothing in section 2.11 required defendant to accept plaintiff's potential purchaser under any circumstances. Nor does section 2.11 afford plaintiff a right of first refusal.

Finally, as to plaintiff's argument that the loan would not have been in default had the $1,566,839 remaining letter of credit proceeds been applied to interest due under the loan rather than principal, the loan, as the record discloses, would still have been in default when this foreclosure action was commenced. As of that date, plaintiff's default in interest payments amounted to at least $2,318,251, so that even if the approximate $1,500,000 letter of credit balance had been applied to interest and the other undisputed amounts due and owing as of August 31, 1992, plaintiff would still be in default in the amount of $751,412. The record also discloses that the property's net operating income for the months of June through August 1992 was insufficient to cover this shortfall.

As to plaintiff's cross-motion, since the two additional causes of action as to which leave to amend was granted lack merit because the funds were properly applied and, in any event, plaintiff could not have been damaged thereby, leave to amend should have been denied. The lock box proceeds were properly applied, as mandated by sections 1.09 and 1.14 (b) of the modification agreement, to past due interest installments. As to the second proposed cause of action, of the $1,378,696 in funds wired by LRA to defendant upon consummation of the modification agreement, $175,000 was applied to the personal obligations of a third party as partial consideration for defendant's release of that party's guarantee of the loan and in payment. Defendant's expenses in negotiating and consummating the modification agreement were also paid and the balance, $1,120,030, credited to the outstanding interest then due and owing. These funds were also applied in accordance with the terms of the modification agreement and the payments

were, in fact, consented to by plaintiff. Concur—Murphy, P. J., Sullivan, Rubin, Ross and Williams, JJ.