STANFORD SQUARE, L.L.C., a California limited liability company Plaintiff,

v.

NOMURA ASSET CAPITAL CORPORATION, Defendant.

No. 00CIV1001(VM).

United States District Court, S.D. New York.

July 23, 2002.

William J. Kelleher, Jr., Rockville Centre, NY, John B. Amrod, Amrod & Van Der Waag, L.L.P., Garden City, NY, Bruce A. Tondre, Tondre & Schumacher, P.C., Denver, CO, Steven G. Sklaver, Broomfiled, CO, for Stanford Square, LLC.

Nancy Prahofer, Dechert, Price & Rhoads, New York, NY, for Nomura Asset Capital Corp.

## CORRECTED DECISION

MARRERO, District Judge.

Plaintiff Stanford Square, LLC (hereinafter "Stanford"), brought this action, invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, against defendant Nomura Asset Capital Corporation (now known and appearing before the Court as Capital Company of America) (hereinafter "Capital"). Stanford's complaint alleges breach of contract and related claims. Capital responded with a counterclaim and now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to dismiss Stanford Square's claims and to seek damages on its counterclaim. For the reasons discussed below, Capital's motion is granted in part and denied in part.

## I. BACKGROUND

The dispute that is the subject of the motion before the Court arose out of an agreement between the parties by which Capital was obliged to make a loan to Stanford, subject to specified preconditions. For reasons described below, however, the loan was never funded. Stanford filed the instant suit, charging in its first claim that Capital committed anticipatory breach of contract and of the implied covenant of good faith and fair dealing. In turn, Capital asserts that Stanford never fulfilled the conditions precedent under the loan agreement, and thus, that Capital's obligation to fund never came due. In its second claim, Stanford demands the refund of certain transaction fees it paid. In response, Capital's counterclaim demands the payment of costs and losses it incurred, discounted by the fees Stanford paid.

The lumbering history of the parties' dispute began in September 1997, when Stanford and Capital entered into a $15,750,000 mortgage loan commitment agreement (hereinafter the "Agreement"). (Plaintiff's First Amended Complaint and Jury Demand (hereinafter "Compl.") ¶ 5 and Ex. A). The Agreement required Stanford to satisfy several conditions precedent, including the delivery of leases,

environmental reports, engineering reports, a credit history, and payment of non-refundable fees. (Compl.¶ 5).

Pursuant to the Agreement, Stanford paid Capital a *non-refundable commitment fee* of $157,500. (Amended Answer and Counterclaim (hereinafter "Answer") ¶ 6; Agreement, at 1, 6). In addition, on September 29, 1997, Stanford exercised an "early interest rate lock" option, paying a deposit of $236,250 in exchange for a fixed interest rate effective through the term of the Agreement. (Compl.¶¶ 21–24). Stanford also paid a $6,500 application fee and $15,000 deposit for third party reports. (Pettinato Affidavit dated April 11, 2001 (hereinafter "Pettinato Aff.") at ¶ 33). The parties agree that the sum of $257,750 is the refundable amount paid by Stanford for purposes of the Early Rate Lock calculations. (Pettinato Aff. at ¶ 33; Memorandum of Law of Defendant the Capital Company of America LLC (Successor to Nomura Asset Capital Corporation) in Support of its Motion for Summary Judgment (hereinafter "Def.'s Memo"), at 24; Memorandum of Law of Plaintiff Stanford Square, LLC in Support of its Opposition to Defendant's Motion for Summary Judgment (hereinafter "Pl.'s Memo"), at 5).

In connection with the early interest rate lock, Capital was obligated to "enter into hedging transactions by selling U.S. Treasury Securities of a maturity approximating the maturity of the proposed loans, or by such other method as [Capital] may choose in its sole discretion." (Compl. ¶ 23; Agreement, at 21). If the loan did not close, the Agreement provided that the interest rate lock deposit would be refunded, less any losses from the hedging transactions and fees and expenses incurred by Capital in connection with the loan. (Compl.¶ 24).

In the situation of a fixed interest rate commitment, a hedging transaction is used to offset the financial risk that interest rates will change. For Capital, once it hedged its rate-lock commitment it would have two aggregate entries in its books: one consisting of loans and rate-locked commitments, including the Stanford interest-rate-locked commitment; the other of aggregate hedged positions. The entries' values move in opposite directions as interest rates rise and fall, thereby offsetting one another and minimizing financial risk. (Reider Affidavit dated April 13, 2001 (hereinafter "Reider Aff.") at ¶¶ 8–10).

In response to Stanford's exercise of its early interest rate lock option, Capital confirmed on September 30, 1997 that the fixed interest rate would be 7.82 percent. In order to determine what transactions would be necessary to accomplish the hedge, Capital calculated the financial effect a change in interest rate would have on its portfolio. Capital expressed the financial effect as the dollar *loss* in the value of the portfolio, which now included the Stanford loan, that would result from an increase in market interest rates of one basis point (hereinafter the "DV"). In this case, Capital used a DV that was commercially available through Bloomberg financial services. (Answer ¶ 25; Reider Aff. at ¶ 13). Capital then needed to identify the transactions that would yield an approximately equal dollar *gain* based on the same interest rate movement.

To hedge the Stanford loan, as a fixed interest loan, Capital sold U.S. Treasury Securities maturing in August 2002 having a face amount of $10,000,000 and U.S. Treasury Securities maturing in August 2007 having a face amount of $7,000,000. Capital recorded these sales in its handwritten trading log and computer system. (Reider Aff. at ¶ 13–15).

Stanford alleges, without support or elaboration, that Capital's "words and conduct indicating it did not intend to fund the

loan constituted an anticipatory breach of contract." (Compl.¶ 16). Stanford further claims that Capital "continuously and repeatedly raised new conditions not provided in the Commitment Agreement", making satisfaction of the conditions precedent impossible and thereby breaching the implied covenant of good faith and fair dealing. (Compl.¶ 17).

Under the Agreement, Stanford was to perform certain conditions before the loan would be funded. In particular, Capital points out that Stanford never provided certain leases, an express condition of Capital's obligation to fund the loan. (Declaration of Simon Block at ¶ 4 and Ex. 2 (hereinafter "Rounds Dep.") at 26; Pettinato Aff. at ¶ 6; Agreement, at 19). In addition, Stanford was to provide Capital with a first mortgage on the property to secure the loan. (Agreement, at 10). This condition was not satisfied because Stanford never arranged for the release or subordination of a Deed of Trust, recorded against the property in 1985. Capital was further troubled by its discovery that Rounds, a general partner of Stanford Square, had a multi-million dollar judgment outstanding against him and had insufficient funds to satisfy the judgment. (Rounds Dep. at 79–80).

To address these issues, on July 29, 1998, Stanford and Capital executed a Revised Commitment Extension and Modification Agreement that retroactively extended the Agreement from April 15 through August 31, 1998. Capital accommodated Stanford's request that the Agreement's leasing requirements be relaxed. (Rounds Dep. at 95). In lieu of providing Capital with the first mortgage, Stanford agreed to pay an increased interest rate on the proposed loan. (Rounds Dep. at 96–97; Pettinato Aff. at ¶ 17). To assuage Capital's concern that Rounds was insolvent, the parties altered the "Borrower Structure" to create a bankruptcy-remote entity. (Rounds Dep. at 96–97; Pettinato Aff. at ¶ 14).

Despite these modifications, Stanford did not fulfill the conditions. Consequently, on September 2, 1998, the parties executed a Commitment Extension Letter that continued the Revised Commitment Extension and Modification Agreement through September 11, 1998. Even so, Stanford did not deliver an executed lease or leases as required and informed Capital that the proposed lease, which Stanford intended to submit, "fell through" on September 9, 1998. (Rounds Dep. 98–99; Pettinato Aff. at ¶ 20 and Ex. 5).

On September 22, 1998, Capital wrote to Stanford and offered to extend the Agreement again. Stanford never executed the extension offer. On October 16, 1998, not having received an executed copy of its offer, and having failed to reach any other agreement with Stanford, Capital informed Stanford that the Agreement had been terminated and that the hedge position would be broken. (Pettinato Aff. at ¶ 24 and Ex. 7).

Stanford argues that its obligation to perform was excused by Capital's anticipatory breach. As support, Stanford asserts that in late summer 1998, Stanford was informed that Capital had "backed away from" another loan involving Stanford's mortgage broker. (Rounds Dep. at 100–101). Stanford was also informed by an attorney representing a different borrower, that Capital had backed away from its loan commitment to his client. (*Id.*, at 102–03).

On October 16, 1998, because the loan was never funded, Capital broke the hedge position by buying U.S. Treasury Securities maturing on May 2008 in the face amount of $18,000,000. On that day, the yield on the "Benchmark Security"—used to define the interest rate for the loan and

defined as the U.S. Treasury note with a 6.625 percent coupon rate maturing on May 15, 2007—was 4.48 percent, down from the 6.17 percent interest rate the security held on the day the loan rate was locked. Capital asserts this decrease in market interest rate is evidence that Capital incurred losses when it broke the hedge. (Reider Aff. at ¶¶ 5, 18).

In connection with the loan agreement, Capital incurred certain "fees and expenses" totaling $47,254.60.[1] Stanford does not contest these fees. (Pl.'s Memo, at 11).

The heart of the controversy between the parties lies in the calculation of the "hedge losses, if any" provided for in the Agreement. (Agreement, at 7). To describe its computation of damages, Capital submits the affidavit of Craig Reider (hereinafter "Reider"). Reider stated that Capital calculated its hedge losses to be $2,066,400 by using a commercially available formula, the Bloomberg BC Quick Yield Analysis (hereinafter "Bloomberg Calculator"). By inputting variables (the locked interest rate, the maturity of the loan, and balloon payment date, if any) into the Bloomberg Calculator, Capital determined the increase in the value of the Agreement during the hedge period. (Reider Aff. at ¶ 20). Reider stated that the Commitment increased by 13.12 percent, thus totaling $2,066,400. (Reider Aff. at ¶¶ 21–22).

Reider further explained that theoretically the hedge position and loan commitment move in equal and opposite directions. Thus, if the loan commitment increased in value by $2,066,400, then the hedge position decreased in value by $2,066,400. (Reider Aff. at ¶ 22).

Reider was informed that due to an internal error, Capital provided Stanford with an inaccurate, lower loss figure of $2,063,484. Capital takes credit for its error and seeks the lower figure in its counterclaim. (Reider Aff. at ¶ 23).

Stanford takes issue with Capital's hedging practices on the ground that Capital entered into them on a portfolio-wide basis rather than on a particular-commitment-by-particular-commitment basis. Stanford repeats this point frequently, despite the clear and explicit terms of the contract that grant Capital "sole discretion" over its hedging practices. (Agreement, at 20).

In a similar vein, Stanford objects to Reider's affidavit on the theory that he lacks personal knowledge of the particular transactions. Apparently, Stanford considers Reider's review of relevant documents, and his experience as a trader employed by Capital and responsible for entering into hedge transactions for Capital, as insufficient basis to provide personal knowledge. To satisfy its objection, Stanford would rather that Reider himself have actually made each trade and data entry in question.

Stanford seeks to create a material question of fact by submitting an expert affidavit provided by Dr. Rene Stulz (hereinafter "Stulz"), a highly credentialed economics professor and prolific writer on the subject of hedging transactions. Stulz stated that his review of Reider's affidavit, in which Reider explains Capital's hedging practice in general and as to Stanford in particular, and its accompanying exhibits, led him to conclude that Capital's loss

---

1. Specifically, Capital incurred $86.00 in credit searches, $3,216.92 in public records searches, $3,730.00 in accounting fees, $4,500.00 in engineering and environmental reports, $1,000.00 in Seismic survey costs, $450.00 in asbestos survey costs, $2,397.00 in travel costs, $566.50 in title fees, $5,750.00 in appraisal costs, $800.00 in insurance review and $24,758.18 in legal fees. (Pettitano Aff. at ¶ 30).

figure of $2,066,400 on the Stanford loan is questionable and also that Capital's use of the Bloomberg Formula is theoretically and methodologically flawed. (Stulz Affidavit dated June 2, 2001 (hereinafter "Stulz Aff.") at ¶¶ 4, 5). Moreover, Stulz suggests that it would not be unusual for a financial institution of Capital's stature to leave positions in amounts as large as Stanford's loan unhedged. (*Id.*, at ¶ 6). Beyond these observations, he does not offer any other views. For instance, he does not identify a typical hedging practice for a financial institution of Capital's stature or for the transaction in this case, or an appropriate methodology for calculating hedge losses in this case.

Further to Stulz's brief opinion, Stanford points out that Capital did alter its hedging positions in response to economic turmoil in Asia during the hedge period. During the fall of 1998, Capital left $100 Million unhedged, a change from Capital's usual $20 Million unhedged position. (Reider Dep. at 33–35). Stanford hopes that the essence of Stulz's skepticism, Capital's practice of adopting its hedge positions in the aggregate, and variable hedge policy should cast doubt Capital's claim of damages, render quantification of such alleged losses impossible, or, at the very least, demonstrate that Capital's calculation is unreasonable.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" demonstrate an absence of any genuine issue of material fact and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To support a granting of the motion, the Court must determine from the record before it that a reasonable trier of fact would not be able to find in favor of the non-mover. *See Brady v. Colchester*, 863 F.2d 205, 211 (2d Cir.1988). In considering the motion, the evidence is viewed in the light most favorable to the non-moving party, and reasonable inferences and factual conflicts are resolved in his favor. *See Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir. 1992). An expert's affidavit may raise a material question of fact so long as the expert, in his affidavit, sets forth more than mere conclusory opinions. *Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25–26 (2d Cir.1994).

### B. *STANFORD SQUARE'S FIRST CLAIM*

Capital argues it is entitled to summary judgment on Stanford's "First Cause of Action", which asserts both anticipatory breach of contract and breach of the covenant of good faith and fair dealing, because the claim fails as a matter of law. (Def.'s Memo, at 15). Capital argues that Stanford cannot show that Capital repudiated the contract, as required under New York law. Further, Capital points out that Stanford's allegations of breach of the covenant of good faith and fair dealing are conclusory and unsupported by any facts.

#### 1. *Anticipatory Repudiation*

To establish anticipatory repudiation under New York law, a plaintiff must identify an " 'overt communication of intention' not to perform." *O'Shanter Resources, Inc. v. Niagara Mohawk Power Corp.*, 915 F.Supp. 560, 567 (W.D.N.Y. 1996) (quoting *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 408 N.Y.S.2d 36, 379 N.E.2d 1166, 1168 (1978)). Further, anticipatory repudiation occurs where there is objective action, "a definite and final com-

munication of the intention to forego performance." *Rachmani Corp. v. 9 East 96th Street Apartment Corp.*, 211 A.D.2d 262, 629 N.Y.S.2d 382, 385 (1st Dep't 1995). Stanford's anticipatory repudiation allegation is critical to Stanford. because, if proven, Stanford believes it should be relieved from showing an element of the prima facie case of breach of contract: that Stanford was ready and willing to perform its future obligations. *See, e.g., American List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 550 N.Y.S.2d 590, 549 N.E.2d 1161, 1165 (1989).

Here, despite this claim's importance, Stanford's allegations relating to it stand alone and unsupported. Stanford does not identify any communication by Capital to Stanford expressing an intention not to fund the loan. Stanford asserts that because it learned from third parties that Capital had "backed away" from other unrelated loan commitments, Capital committed anticipatory breach in connection with Stanford's Agreement. Stanford buttresses this conclusion by referencing trade journal reports concerning Capital's strategy for coping with destabilized markets abroad, and an internal delay of communication between Capital's counsel and Capital's loan closing officer. (Pl.'s Memo, at 23 n. 9). Viewing these submissions together, and in the light most favorable to Stanford, this Court finds that no reasonable fact finder could identify a definite and final communication of Capital's intention to forego performance. As Stanford has not introduced evidence to support this critical element of its cause of action, Stanford's claim of anticipatory repudiation can not survive summary judgment.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

Stanford's alternative theory of breach of the implied covenant of good faith and fair dealing suffers the same fate due to a fatal lack of factual specificity. A claim asserting a breach of the implied covenant of good faith and fair dealing would not survive dismissal as a matter of law pursuant to Fed.R.Civ.P. 12(b)(6) if it "fails to describe the specific actions on the part of … defendants that allegedly breached this duty." *Yucyco Ltd. v. Republic of Croatia*, No. 96 Civ. 5559 (DC), 1997 WL 728173, *6 (S.D.N.Y. Nov.19, 1997). The conclusory allegations of Stanford's complaint, and dearth of detail in Stanford's other submissions to the Court in connection with the matter at hand, are even more troubling on a motion for summary judgment, which must be made on the basis of the pleadings and factual submissions. *See* Fed.R.Civ.P. 56(c).

In its Amended Complaint, Stanford did not specify any conditions added to the Agreement affecting performance of its commitments, or in what way such conditions made Stanford's contractual obligations impossible to perform. Then, by failing to discuss, or make any factual submission tending to support this claim in its opposition to Capital's motion for summary judgment, Stanford appears to abandon the claim through neglect.

More compelling, the evidence on the record contradicts Stanford's allegations. The record reflects that the amendments to the Agreement were made as accommodations by Capital to facilitate Stanford's performance of the conditions precedent. For instance, Capital extended the Agreement beyond its original term twice, and offered to extend a third time. Similarly, Rounds admitted that Capital relaxed the lease condition precedent, as Stanford had requested. (Rounds Dep. at 141–42).

As Stanford failed to introduce sufficient evidence to support its conclusory allegations, the Court grants summary judgment

in Capital's favor on Stanford's First Claim.

## C. CLAIM FOR REFUND OF DEPOS-ITS, COSTS AND HEDGE LOSSES

The parties' principal dispute concerns the existence and amount of "hedge losses". In its second claim, Stanford demands refund of certain money paid to Capital. In its counterclaim, Capital demands a payment from Stanford to cover its alleged hedge losses, discounted by the refund of fees at issue in Stanford's second claim.

Neither party disputes the clear language of the Agreement that:

> In the event that the Rate Lock Period has expired and [Capital] has not yet funded the Loan, [Capital] shall have the right at any time to close out the Hedge Position . . . [Capital's] only obligation to [Stanford] shall be to return the refundable portion of the Early Rate Lock Deposit after setting off (A) losses incurred in the Hedge Position, if any, and (B) fees and expenses (including attorneys' fees) incurred by [Capital] in connection with the proposed Loan.

(Agreement, at 7). In light of this contractual language, the Court is persuaded that Stanford's Second Claim for refund of fees ignores the clear, but contentious, step of the refund calculation: the reduction of any refund amount by hedge losses, if any.

A party claiming damages must establish the existence of loss with certainty; however, a reasonable calculation of the quantum of damages will suffice. *See Lexington Prods. Ltd. v. B.D. Communications, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982); *Reichman v. Warehouse One. Inc.*, 173 A.D.2d 250, 569 N.Y.S.2d 452, 453 (1st Dep't 1991) (the loss to be recovered must be ascertained with reasonable certainty, not "mathematical accuracy or absolute certainty or exactness"). Further, the fact that the calculation of damages might be complex or difficult to ascertain does not preclude their award. *See Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 412 N.Y.S.2d 589, 385 N.E.2d 281, 283 (1978).

Capital states that it suffered hedge losses based on the drop in the yield on the benchmark security, which was agreed upon as a measure of loss. Capital calculated its losses to amount to $2,063,484. Stanford contends that there were no hedge losses, and even if there were losses, the calculation submitted by Capital is unreasonable.

### 1. The Refundable Portion of the Early Rate Lock Deposit

The Agreement's clear language requires Capital to return to Stanford the "refundable portion of the Early Rate Lock Deposit" with set-offs, discussed below. Stanford and Capital have stated that Stanford paid $257,750 on September 29, 1997 in order to exercise its Early Rate Lock Option, and that this amount was refundable. (Pettinato Aff. at ¶ 33; Pl.'s Memo, at 5). Therefore, at best, Stanford is entitled to a return of $257,750.

### 2. The Reduction for Costs and Fees

Capital submitted an affidavit to establish its out-of-pocket expenses as amounting to $47,254.60. Stanford does not contest this accounting and concedes that this amount should be deducted. (Pl.'s Memo, at 11). Accordingly, Capital's obligation to return Stanford's refundable portion should be reduced by the agreed amount of $47,254.60. Thus, according to the Agreement's clear language, Stanford should be paid $210,495.40, off-set by the amount of hedge losses, if any.

### 3. The Existence of Hedge Losses

■ Capital states that it has proven the existence of hedge losses by establishing that it had entered certain transactions to hedge the exposure arising from the Stanford interest rate lock and by identifying a decrease in the benchmark security's yield. First, Capital introduced documentary evidence showing that it entered into short sales of U.S. Treasury Securities on September 30, 1997, with the purpose of hedging the additional financial risk arising from the Stanford interest rate lock. Second, Capital introduced documentary evidence showing that it purchased U.S. Treasury Securities on October 16, 1998, to break the hedge position attributable to the Stanford interest rate lock. Capital explained its hedging policies and practices, and applied the same to the Stanford-related transactions. Capital also introduced evidence, not contested by Stanford, that the interest rate between September 30, 1997 and October 16, 1998 decreased from 6.17 to 4.48 percent. Capital further stated that the decrease in interest rates reflects an increase in the value of its commitment to Stanford. When the loan went unfunded, Capital broke the hedge position to its financial detriment because of the commitment's increased value.

Stanford asserts that Capital's showing is insufficient to establish that Capital in fact suffered damages. According to Stanford, it is impossible to show any damages caused by the hedging transactions attributable to the Stanford loan commitment because of Capital's practice of hedging all of its loan commitments in the aggregate. These sweeping challenges, however, do not address Capital's documented testimony that damages exist; they only tend to show that any such damages may be difficult to ascertain. Accordingly, to the extent that Stanford seeks to negate the element of damages with evidence that Capital generally hedged its loan commitments in the aggregate, Stanford's argument must fail.

As additional support for its position, Stanford submits Reider's deposition testimony in which he stated that it is "possible" that Capital made a profit ultimately, later in time, when it closed out the short positions it took upon ending the Stanford hedge position. (Reider Dep. at 150–52). Apparently Stanford suggests that any short term loss to Capital arising out of its Stanford loan-related-hedge-position is immaterial because ultimately, in the larger picture, Capital's total financial scheme, over time, might be profitable. The Court is not persuaded that Capital's possible financial well-being over the long haul is relevant to, much less that it negates the existence of, damages arising out of the Agreement and its related hedging transactions. Consequently, the Court concludes that on the record before it there is no question of material fact as to the existence of damages in the form of hedge losses: Capital has met its burden to establish by a preponderance of the evidence the absence of a genuine issue that it sustained damages.

### 4. The Calculation of Hedge Losses

■ In this Court's view, the essence of the parties' dispute boils down to Stanford's skepticism that Capital has actually suffered the quantum of losses it alleges resulted from the Stanford loan hedging transactions. Capital has submitted evidence showing that it used the Bloomberg Calculator to approximate its losses. Further, Capital submitted affidavits that describe the Bloomberg Calculator's formula as well as its underlying theory and methodology. Finally, Capital submitted affidavits describing relevant industry practices. In opposition, Stanford criticized the hedg-

ing practices of Capital and introduced a brief expert opinion that challenges the methodology and output of the submitted formula.

To create a question of material fact and defeat a motion for summary judgment, an expert's affidavit must consist of more than bare conclusions. *See Iacobelli*, 32 F.3d at 25–26. In *Iacobelli*, the plaintiff submitted two expert affidavits in opposition to a motion for summary judgment. The movant challenged these affidavits on the grounds that they did not "set forth specific facts" and failed the *Daubert* test of reliability. *Id.*, at 25 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333 (7th Cir.1989)). The district court agreed with the movant's argument and disqualified the expert affidavits; the Second Circuit reversed. *See id.* The Second Circuit reasoned that the construction industry and geo-technical experts did not present the " 'junk science' problem that *Daubert* meant to address." *Id.* Rather, the Second Circuit held that an affidavit satisfies Fed.R.Civ.P. 56 if it states the facts upon which the expert's opinion is based. The Second Circuit Court found that, in the case before it, the experts identified the documents and facts on which they based their conclusions and described industry practices and approaches. Hence, while their opinions "may not have been as in-depth as the district court would have liked", they were not bare allegations. *Id.* The Court then reversed the district court's award of summary judgment on that issue because the expert affidavits raised factual issues. *See id.*, at 26.

Here, Stulz's expert affidavit submitted by Stanford is similar to those submitted in *Iacobelli*. While this Court would prefer a more extensive analysis, it is persuaded that Stulz's affidavit does satisfy Rule 56 because it identifies the documents reviewed by Stulz, and references to industry practices that are relevant to the calculation of hedge losses. Stulz's affidavit presents evidence sufficient to raise factual issues concerning Stanford's contention that the hedge loss calculation and methodology submitted by Capital is unreasonable. Considering this testimony, as well as the variable hedging practices of Capital during the hedge period, the Court is persuaded that there are triable questions of material fact as to the amount of damages and the reasonableness of the damage calculation submitted by Capital. Therefore, the Court denies Capital's motion for summary judgment on Stanford's second claim.

### D. CAPITAL'S COUNTERCLAIM FOR HEDGE LOSSES

Capital asserts a counterclaim against Stanford for "the difference between '[Capital's] expenses,' as defined as [Capital's] 'losses incurred in the Hedge Position ...' and the 'fees and expenses (including attorneys' fees) incurred by [Capital] in connection with the proposed Loan,' and certain monies previously paid by plaintiff to [Capital]." (Answer ¶ 35). Capital identifies unambiguous contractual language that if Capital's hedge losses, costs and fees:

> exceed the combined Early Rate Lock Deposit and the Commitment Fee (after deduction of the non-refundable portion), [Stanford] shall pay [Capital] the difference within two business days following termination of the Rate Lock Period.

(Agreement, at 7). Stanford does not challenge the contractual language, and limits its opposition to a criticism of Capital's belief in and computation of hedge losses.

As already described in section II(C), the parties agree that Stanford is entitled to a refund of $ 210,496.40, reduced by the amount of hedge losses suffered by Capital. The Court has determined that a triable question of material fact exists as to the quantum of the hedge losses. Consequently, the Court denies Capital's motion for summary judgment on Stanford's second claim. That question of material fact likewise precludes the Court from granting Capital's motion for summary judgment on Capital's counterclaim.

### III. *CONCLUSION AND ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that Capital's motion for summary judgment on the First Claim asserted in Plaintiff's First Amended Complaint is GRANTED; and it is further

**ORDERED** that Capital's motion for summary judgment on the Second Claim asserted in Plaintiff's First Amended Complaint is DENIED; and it is finally

**ORDERED** that Capital's motion for summary judgment on its Counterclaim is DENIED.

**SO ORDERED.**