**STANFORD SQUARE, L.L.C., a California limited liability company Plaintiff,**

v.

**NOMURA ASSET CAPITAL CORPORATION,** Defendant.

No. 00 CIV. 1001 VM.

United States District Court, S.D. New York.

Sept. 12, 2002.

diction pursuant to 28 U.S.C. § 1332 to assert breach of contract claims against defendant Nomura Asset Capital Corporation (now known and appearing before the Court as Capital Company of America) ("Capital"). Capital filed a counter claim seeking to recover "Hedge Losses" that it contends are due under the Contract. On cross motions for summary judgment, the Court found that Stanford was entitled to a return of a refundable deposit reduced by Capital's costs, expenses and Hedge Losses. But, if Hedge Losses, costs and fees exceed the refundable deposit, then Capital is due the difference. The Court also determined that the question of what Hedge Losses Capital incurred presented a genuine issue of material fact.[1]

The Court conducted a bench trial to determine what quantum of damages is due which party, and now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court finds Capital entitled to a payment from Stanford in an amount of $1,658,075.40, representing Capital's Hedge Losses and other allowable costs reduced by Stanford's refundable deposit.

William J. Kelleher, Jr., Rockville Centre, NY, Steven G. Sklaver, Broomfield, CO, for plaintiff.

Nancy Prahofer, Dechert, Proce & Rhoads, New York City, for defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Stanford Square, LLC ("Stanford") invoked the Court's diversity juris-

### FINDINGS OF FACT

1. While the Court has reviewed and considered all of the live testimony and designated trial exhibits offered in connection with the trial of this matter, the Court addresses only those items of evidence relevant to its legal conclusions.

2. The parties agree that the facts in the Decision are undisputed and are not issues for trial.

---

[1] See Corrected Decision dated July 23, 2002 ("the Decision"), reported as *Stanford Square* *L.L.C. v. Nomura Asset Capital Corp.*, 228 F.Supp.2d 293 (S.D.N.Y.2002).

3. According to the agreement between Stanford and Capital, dated September 27, 1997 (the "Agreement"), the parties agreed that:

In the event that the Rate Lock Period has expired and [Capital] has not yet funded the Loan, [Capital] shall have the right at any time to close out the Hedge Position ... [Capital's] only obligation to [Stanford] shall be to return the refundable portion of the Early Rate Lock Deposit after setting off (A) losses incurred in the Hedge Position, if any, and (B) fees and expenses (including attorneys' fees) incurred by [Capital] in connection with the proposed Loan. [If Capital's hedge losses, costs and fees] exceed the combined Early Rate Lock Deposit and the Commitment Fee (after deduction of the non-refundable portion), [Stanford] shall pay [Capital] the difference within two business days following termination of the Rate Lock Period.

The Agreement did not define how to calculate "losses incurred in the Hedge Position" or "Hedge Losses".

4. On September 29, 1997, Stanford exercised an interest rate lock for the proposed loan by, *inter alia*, paying Capital a refundable deposit of $257,750 (the "Refund Amount").

5. The Agreement provided that the interest rate lock would be calculated at the time of the "rate lock" by adding an "interest rate spread" of 165 basis points to the yield on a ten-year U.S. Treasury Note with a 6.625% coupon rate maturing on May 15, 2007 (the "Benchmark Security").

6. In connection with providing the fixed interest rate to Stanford, Capital entered into a hedging transaction that theoretically would protect against the financial risk that interest rates would change adversely prior to the closing on the underlying loan. To hedge an asset against the risk of change in a market condition, a lender or investor will enter a financial transaction that it believes will have an approximately equal and inverse financial reaction to market changes as they occur. In the event market conditions change, the position taken in one transaction that decreases in value should be balanced by another that increases and offsets any loss. By this strategy, the hedging party protects itself against a particular change in the market that would reduce the value of an asset.

7. The industry practice is to hedge on a portfolio-wide basis. In this approach, an initial transaction is taken to hedge an individual asset when it is added to the asset portfolio. Immediately thereafter the initial transaction becomes an indistinguishable part of the hedge portfolio's overall position, losing any specific association with the individual asset. As a result, there is no separate accounting for any individual hedge position.

8. Indeed, Capital hedged the loans and commitments that it made on a portfolio-wide basis. That is, Capital placed the individual mortgages and loans into a larger mortgage portfolio (the "Mortgage Portfolio") consisting of many other loans, and maintained a separate hedge portfolio (the "Hedge Portfolio"). The Hedge Portfolio was to have an equal but inverse financial impact as the Mortgage Portfolio. Stanford does not take issue with Capital's portfolio-wide hedging practice.

9. To fully hedge its Mortgage Portfolio against changes in the treasury interest rate, Capital usually took short positions in U.S. Treasury Notes. To take a short position means that Capital would borrow and sell a U.S. Treasury Note. Later, to close out the short position, Capital would

have to purchase the shorted U.S. Treasury and return it to the lender.

10. In order to determine what transactions would be necessary to hedge the new risk associated with the Agreement and its rate lock, Capital calculated the financial effect that a change in the interest rate would have on its Mortgage Portfolio including that new asset. Capital expressed the financial effect as the dollar *loss* in the value of the Mortgage Portfolio that would result from an increase in market interest rates of one basis point. The Court refers to the portion of the Mortgage Portfolio attributable to the Agreement as "the Stanford Commitment".

11. In order to hedge the Stanford Commitment on September 29, 1997, Capital short-sold two sets of U.S. Treasury Notes, one with a maturity date of August 2002 and a face value of $10,000,000, and another with a maturity date of August 2007 and face value of $7,000,000.

12. Capital recorded these sales in its handwritten trading log and computer system.

13. Months later, on July 29, 1998, Stanford and Capital entered into a revised commitment extension and modification letter (the "Revised Agreement"). The Revised Agreement defined Hedge Loss to be "all actual losses incurred by [Capital] in connection with the Hedge Position taken by [Capital] in order to provide the Locked Interest Rate to [Stanford]." (Pl.'s Ex. 12.).

14. For the period after the Revised Agreement went into effect with its definition of Hedge Losses, Capital maintained the same portfolio-wide hedging and record keeping practices it had followed from the inception of the Stanford's rate lock on September 29, 1997.

15. For reasons discussed in the Decision, the Stanford Commitment was never funded.

16. On October 16, 1998, Capital informed Stanford that the Revised Agreement was terminated and that the relevant hedge position had been broken. The Court refers to the period of time during from September 29, 1997 to October 16, 1998 as the "Rate Lock Period."

17. Capital broke its hedge position that day by buying U.S. Treasury Notes maturing in May 2008 in the face amount of $18,000,000. The yield on the Benchmark Security on the day the hedge position was broken was 4.48 percent, which is lower than the 6.17 percent interest rate that the security held on the date of the interest rate lock. The decrease in the interest rate on the benchmark security shows that Capital incurred losses when it broke the hedge. Capital did not have any offsetting gain because the Revised Agreement went unfunded.

18. Capital has kept the Refund Amount on the grounds that the Hedge Losses, costs and fees it incurred exceed the Refund Amount.

19. The parties agreed that Capital's costs and fees associated with the Stanford Commitment total $47,254.60.

20. Capital calculated its hedge losses to amount to $2,066,400. To describe its computation of damages, Capital submitted testimony from Craig Reider ("Reider") who was chief operating officer at Capital from December, 1997 through 2000. Reider stated that by inputting variables like the locked interest rate, maturity of the loan, and balloon payment date, if any, into the Bloomberg Quick Yield Analysis, a commercially available financial calculator (the "BC"), Capital was able to determine that the loan commitment increased by 13.12 percent. Reider further

explained that because of the theory that a hedge and a commitment have an inverse one-to-one relationship, when the Agreement's value increased by 13.12 percent on the day the hedge was broken, it resulted in an equivalent decrease in value of the hedge position. Reider stated that the change in percentage is equal to the dollar figure of $2,066,400.

21. Capital, taking credit for an internal accounting error it made and communicated to Stanford prior to the commencement of this action, seeks a lower loss figure of $2,063,484.00 in this action.

22. Capital only kept and provided twelve reports summarizing the performance of its Mortgage and Hedge Portfolios from the Rate Lock Period (the "Position Summary Reports"). (*See* Pl. Exs. 33–44, and 46; Def. Ex. 1.) There is one Position Summary Report from almost every month during the Hedge Period. A thirteenth was produced, but appears incomplete and, as such, misleading.

23. The Position Summary Reports do not reflect the daily changes in the Hedge Portfolio. Without daily or aggregate reports for the entire Rate Lock Period, Capital had no direct proof to demonstrate that the Mortgage and Hedge Portfolios achieved in fact the intended inverse one-to-one relationship.

24. The September 1997 through March 1998 Position Summary Reports contain cumulative data measured from April 1, 1997 and identifying the mismatch between the Asset and Hedge Portfolios. Because the Position Summary Reports from April 1998 through October 1998 provide information regarding discrete points in time, they do not fully reflect either Portfolio's performance after March, 1998.

25. Capital's lack of documents is not suspicious, and Stanford makes no allegation of spoliation or bad faith as regards the unavailability of the entire daily reports record. Because the information on such reports changes constantly throughout each day as portfolios made gains and losses, the industry's practice is to discard physical copies of Position Summary Reports. Aside from the value of record-keeping as record-keeping, there was no business reason to keep a daily, weekly or monthly Position Summary Report. Nor was there any custom or practice in the industry of keeping such records because the industry used formulas to calculate hedge losses.

26. During the later half of 1998 the financial markets were extremely volatile, especially following Russia's default on certain loans from the International Monetary Fund in August of that year (the "Russian Loan Default"). The volatility was reflected in part by great shifts in interest rates in the days and weeks after August 1998.

27. These erratic market conditions during the final months of the Rate Lock Period had an effect on both the Mortgage and Hedge Portfolios.

28. Moreover, in response to the volatile market conditions, Reider hedged for "spread risk," which is the difference between the yields on the securities and treasury notes, in addition to change in interest rates.

29. In hedging for spread risk, Capital appears to have taken fewer short positions and therefore would have a lower loss figure than that identified by Capital.

30. Stanford's sole contention was that Capital's calculation of its Hedge Loss based on the use of the BC was inappropriate. Stanford argued that Hedge Loss, as defined in the Revised Agreement, meant "actual" expenses incurred by Capital as opposed to a sum derived through a mathematical formula. Stanford present-

ed Dr. Rene Stulz ("Stulz") as its expert witness.[2] Stulz testified that because the Revised Agreement called for actual loss, and because the BC is an inappropriate measure of Hedge Loss, there was no way to determine the quantum of Hedge Losses. Stanford argued that, as a matter of law, the uncertainty in calculation of hedge losses precluded the Court from making any damage award in Capital's favor.

31. Capital asserted that its calculation provided a reasonable and accurate measure of its actual losses associated with the hedge position. Its expert witness, Dr. Andrew Carron ("Carron"),[3] stated that under the Revised Agreement, Hedge Loss means any loss incurred when the hedge position is broken without the loan having been funded. In that situation Capital is deprived of any offsetting gain it could realize by selling the funded loan as a security. According to Carron, the BC is an accurate method for calculating Hedge Loss that also conforms with industry practices.

### Possible Methods of Calculating Hedge Losses

32. The simplest and most obvious way for Capital to prove actual losses resulting from the Stanford Commitment would have been to identify specific hedge transactions entered into on September 29, 1997 in response to Stanford's exercise of the rate lock option, and then prove that those specific hedge transactions were closed out on October 16, 1998. With that information, subtracting the sale price from the purchase price would show whether Capital realized a profit or loss (the "Direct Formula").

33. The Court cannot use the Direct Formula to calculate damages because Capital hedged its mortgage portfolio on a portfolio-wide basis.

34. Stulz proposed another method for calculating Hedge Loss which would use the aggregate gains or losses of the entire Hedge Portfolio. Hedge Losses may be calculated by adding together the daily profit and loss statements for the entire 265–day–period, and dividing by the percentage of the overall Hedge Portfolio that was attributed to the Stanford Commitment (the "Stulz Formula").

35. The Court cannot use the Stulz Formula because the twelve days worth of data and incomplete aggregate information contained in the Position Summary Reports is too limited to measure the full 265–day Rate Lock Period. Furthermore, the Stulz Formula is not widely used in the industry or academia.

36. Capital proposed the BC as another, valid method for calculating Hedge Loss. Using to the BC, Capital determined Hedge Losses to be $2,066,400.

37. The BC was originally designed to measure the value of a mortgage portfolio based on "yields," meaning the return on investments. By inputting certain variables, including the yield, interest rate, term and balloon payment for a mortgage, the BC can compute the value of that mortgage.

38. At the same time, because the loan and hedge transactions are intended to match one another, the BC can function as a hedge position calculator and has been so employed in industry practice. Just as by inputting values associated with a loan results in a figure reflecting the value of that

---

**2.** Stulz is a professor of economics who has taught and published extensively on the subject of hedging transactions and theory.

**3.** Carron worked at several investment banks and in the area of mortgage-backed securities and currently is a consultant.

loan, by inputting values associated with a hedge position the BC will likewise render a figure reflecting the value of that hedge position. Indeed, Capital intended its Hedge Portfolio to share characteristics with and track its Mortgage Portfolio closely so that both Portfolios' values could be computed using the same formula.

39. One of the BC's underlying assumptions is that the only risk being hedged is interest rate risk. The BC also assumes that the Mortgage and Hedge Portfolios in fact have offsetting financial effects: equal in magnitude and opposite in direction.

40. Carron's experience is that reliance on a mathematic formula is the most prevalent method of calculating hedge losses in the financial industry. He further stated that the most widely accepted formula in the industry is contained in the BC.

41. Carron created a chart to illustrate the balance between the movements of the Mortgage and Hedge Portfolio. (Def. Ex. 4 (the "Chart")). Based on the twelve complete Position Summary Reports, the Chart shows that the movements of the Hedge Portfolio were nearly equal in magnitude to that of the Mortgage Portfolio. Carron testified that the average deviation for the twelve data points provided by the Position Summary Reports was 0.004 percent in the direction of an over-hedge. Carron further opined that the percent was as close to a perfect hedge, where the deviation is zero, as one could get given the complexities of hedging and the constant movement of markets and positions.

42. The average deviation of 0.004 from the one-to-one-ratio between the Portfolio indicates so close a correlation between the two portfolios it is fair to say Capital achieved its hedging goal. The Stanford Commitment, as a component of the Mortgage Portfolio, shared in that result.

43. Carron found the cumulative data on the relationship between the Mortgage and Hedge Portfolios, available in the September 1997 through March 1998 Position Summary Reports, to be consistent with his Chart. In particular, the aggregate data also shows that the deviation between the Mortgage and Hedge Portfolios was nearly zero. Moreover, it tracked closely with the matched performance of the Portfolios that corresponded with the curve that represented the changes reflected in the twelve, single-day Position Summary Reports. Further, the Chart illustrates how Capital maintained that close correlation between the two Portfolios through August of 1998.

44. Nevertheless, the deviation was approximately four-and-one-half percent in the Position Summary Report for September 30, 1998. This Position Summary Report indicates that Capital took fewer short positions and was underhedged, in response to the volatile market conditions. Further, Reider's statement that he also hedged for spread risk at that time is consistent with the September 30, 1998 Position Summary Report. Thus, the Court concludes that Capital's hedging practices changed in the period around August and September, 1998.

45. From Capital's hedging theory and practice, along with the data from the twelve Position Summary Reports, the Court infers that the BC's underlying assumptions fit the circumstances present from September 1997 through at least June of 1998.

46. Based on his review of the data, and using a simple statistical analysis, Carron believes that the loss figure of $2,066,400 computed using the BC is more than 95 percent accurate. Carron arrived at this confidence level by considering the period after the Russian Loan Default. Carron acknowledged that during this time

Capital may not have been targeting a perfect inverse correlation between the Mortgage and Hedge Portfolios. Instead, Carron agreed with Stulz that Capital may have been under-hedged in response to the volatile market conditions. However, the September 30, 1998 Position Summary Report indicates that during this period the deviation was around four-and-one-half percent. Carron opined that the damage calculation would be even more accurate if one assumed an under-hedge of five percent during that volatile period, based on a maximum deviation of approximately five percent between the Mortgage and Hedge Portfolios, and applied a five percent reduction to the $2,066,500 figure. (Trial Tr. at 209–10, 220, and 298.) This reduced figure would be more than 99 percent accurate and would take into account the market conditions surrounding the Russian Loan Default. (Trial Tr., at 209–10, 220, and 298.)

47. Carron further opined that under his analysis, even if the Position Summary Reports had been available for the entire Rate Lock Period, they would show that Capital incurred Hedge Losses. In fact, only if Capital had been completely under-hedged could it have incurred no Hedge Losses.

48. Carron believed the BC provided an accurate estimate of the actual loss figure that would have been obtained using the Stulz formula if the daily Position Summary Reports for the Rate Lock Period had been available. Carron believed that the margin of deviation between the BC's results and the Stulz Formula would be perhaps a couple of percent different, but no more than five percent. (*See* Trial Tr., at 220–29, 314–16.) Carron found only a remote, one percent possibility that the amount of Hedge Losses would be less than ninety-five percent of the $2,066,400 figure Capital calculated using the BC.

Stated differently, discounting that figure by five percent increases the statistical likelihood of arriving at the actual loss figure to ninety-nine percent.

### CONCLUSIONS OF LAW

1. The Court already set forth the standard for an award of damages. (Decision, at 16–17.)

■ 2. A party must come forward with specific evidence in order to establish the existence of damages flowing from a breach of contract. *See Lexington 360 Associates, v. First Union National Bank of North Carolina,* 234 A.D.2d 187, 651 N.Y.S.2d 490, 492 (N.Y.A.D. 1st Dep't 1996).

■ 3. Having shown the existence of damage, a party may not be denied damages "when it is apparent that the quantum of damage is unavoidably uncertain, beset by complexity or difficult to ascertain." *Berley Indus., Inc. v. City of New York,* 45 N.Y.2d 683, 412 N.Y.S.2d 589, 385 N.E.2d 281, 283 (1978); *see also Wolff & Munier, Inc. v. Whiting–Turner Contracting Company,* 946 F.2d 1003, 1009–10 (2d Cir.1991).

4. For instance, presented with a claim for loss of future profits resulting from a breach of contract, a New York court undertakes a two step inquiry: "First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty." *Kenford Company, Inc. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234, 235 (1986).

5. A "definite and logical connection" between what is proved and found must exist, permitting the fact finder to draw reasonable inferences. *Berley,* 412 N.Y.S.2d 589, 385 N.E.2d at 283. The Court of Appeals in *Berley* rejected a

mathematical formula as speculative because there was no proof that the formula was logically calculated based on actual items of costs or that it would produce a fair estimate of actual damages. As such, it was "but an unsupported opinion." *Id.* at 284.

6. A court ascertains the amount to be recovered with reasonable certainty, not "mathematical accuracy or absolute certainty or exactness". *Reichman v. Warehouse One. Inc.,* 173 A.D.2d 250, 569 N.Y.S.2d 452, 453 (N.Y.A.D. 1st Dep't 1991) (citing 36 N.Y. Jur.2d, Damages § 15, *E.W. Bruno Co. v. Friedberg,* 28 A.D.2d 91, 281 N.Y.S.2d 504 (N.Y.A.D. 1st Dept.1967), *affd.,* 23 N.Y.2d 798, 297 N.Y.S.2d 302, 244 N.E.2d 872 (1968), and *Gombert v. New York C. & H.R.R. Co.,* 195 N.Y. 273, 88 N.E. 382 (1909)); *see also Lexington Prods. Ltd. v. B.D. Communications, Inc.,* 677 F.2d 251, 253 (2d Cir. 1982). The reality of human affairs is that absolute certainty could rarely, if ever, be achieved. Accordingly, the law of New York requires only that damages be ascertainable with reasonable certainty.

■ 7. Here, the parties agreed that Stanford would repay Capital's Hedge Losses if the loan went unfunded. The Court already found that Capital had shown the existence of Hedge Losses, but that the quantum of loss presented a genuine question of material fact.

8. After the hedge was taken, the parties altered their contract and introduced "Hedge Loss" as a defined term meaning "actual losses". Stanford argues that the new definition means only explicitly documented, out-of-pocket expenditures qualify. However, Stanford sets too high a standard. Rather, a mathematical formula may be used where sufficient evidence shows a logical connection between the formula itself and the damages to be measured. *See Berley,* 412 N.Y.S.2d 589, 385 N.E.2d at 284.

9. The financial industry's and Capital's portfolio-wide hedging practices and irregular record-keeping, combined with the financial market's instability in late 1998, turn what theoretically should be simple calculation of money-spent into a more complex equation.

■ 10. Capital cannot be faulted for following its standard hedging and record keeping practice in September of 1997 when the Agreement was signed. The Agreement contained no specific definition of Hedge Losses nor requires any particular method of hedging. There was no indication of anything unusual or unreasonable in Capital's portfolio-wide practice in this regard. Industry practice at the time required nothing more or different.

11. After entering the Revised Agreement, Capital continued without change its standard portfolio-wide hedging practice and what had been its course of conduct on the Agreement for the preceding period. To the extent that there might have been reason to treat the Stanford Commitment hedge differently, such reason arose after the Revised Agreement was entered on July 29, 1998 and Capital agreed that Hedge Losses meant actual losses. The Revised Agreement, however, did not prescribe any particular method for computing or recording Hedge Losses thereafter, nor did it preclude Capital from continuing its prior methods. Accordingly, in so far as the total amount of Hedge Losses Capital claims is affected by the operation of the Revised Agreement, any adjustment indicated may reasonably apply to the final two-and-one-half months of the Rate Lock Period, only. The Court would not consider it reasonable under these circumstances to require that Capital alter its hedging practices or record keeping retroactively by reason of the Revised Agreement.

**208**

12. The Court finds the BC to be an economically sound method, recognized by industry practice, of measuring the Hedge Loss here associated with changes in interest rates. Capital introduced sufficient evidence to show how the BC operates to measure loss from the hedging transactions at issue by demonstrating that the BC's underlying assumptions largely apply here. Capital introduced testimony to show that it sought to hedge interest rate risk and achieve a one-to-one ratio between its mortgage and hedge portfolios. Moreover, the Position Summary Reports provide adequate indication that Capital in fact did maintain a nearly one-to-one ratio.

13. However, as stated by Reider and evinced by the Position Summary Report for September 30, 1998, which indicated that the portfolios had greater deviation during the months of August, September and early October 1998, Capital changed its hedging strategy and appears to have been underhedged slightly at that time. Thus, the Court reduces the figure by five percent, or $103,320.

14. The five percent figure is derived from the deviation between the mortgage and hedge portfolios during late 1998 and meant to reflect the market instability of the time and Capital's change in hedging practice. This discount is especially appropriate in light of Capital's lack of aggregate data or daily Position Summary Reports reflecting the performance of its Mortgage and Hedge Portfolios after the Revised Agreement went into effect. According to Carron's statistical analysis, such a reduction in fact would increase the accuracy of the award to ninety-nine percent.

15. Thus, the Court finds that Capital has incurred $1,963,080 in Hedge Losses associated with the Stanford Commitment. This figure, even before adding the costs and fees incurred, exceeds the Refund Amount.

16. Accordingly, Stanford owes Capital the sum of $1,658,075.40, which represents the amount of costs, fees and Hedge Losses that Capital incurred in hedging the Stanford Commitment, less the Refund Amount.

### *ORDER*

For the foregoing reasons, it is hereby

ORDERED that the Clerk of Court enter judgment in favor of Defendant Nomura Asset Capital Corporation in the amount of $1,658,075.40; and it is finally

ORDERED that the Clerk of Court close this case.

**SO ORDERED.**